# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Nevarez, 2012 IL App (1st) 093414**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL NEVAREZ, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-09-3414 |
| Filed | March 30, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction and enhanced sentence for first degree murder were upheld over his arguments that the trial court erred in denying his motion to suppress, that his sixth amendment right to counsel of his choice was violated and that the sentence enhancement for personally discharging the firearm that caused the victim's death violated *Apprendi*, since the warrant for a search of an apartment building that belonged to defendant's grandfather remained in effect for the two days required to find the victim's body, defendant failed to establish a legitimate expectation of privacy in the apartment searched that would permit him to contest the search, the trial court did not abuse its discretion in refusing to allow an attorney who had previously represented defendant's father to represent defendant, especially when the State indicated it would call the father as a witness for the State, and *Apprendi* did not require the State to plead the sentence-enhancing facts in the indictment. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-04115; the Hon. Dennis J. Porter, Judge, presiding. |

| Judgment | Affirmed. |
|---|---|

| Counsel on Appeal | Samuel E. Adam, of Chicago (Sam Adam, of counsel), for appellant. |
|---|---|
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Susan R. Schierl Sullivan, and Veronica Calderon Malavia, Assistant State's Attorneys, of counsel), for the People. |

| Panel | JUSTICE ROCHFORD delivered the judgment of the court, with opinion. |
|---|---|
| | Presiding Justice Hoffman and Justice Karnezis concurred in the judgment and opinion. |

**OPINION**

¶ 1    A jury convicted defendant, Daniel Nevarez, of first degree murder and he was sentenced to 85 years' imprisonment, which included a 25-year enhancement for personally discharging the firearm that proximately caused the victim's death. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2010). On appeal, defendant contends the trial court erred by: (1) denying his motion to suppress; (2) denying his sixth amendment right to be represented by the counsel of his choice; and (3) imposing the 25-year sentence enhancement in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). We affirm.

¶ 2    The victim, Eric Kaminski, disappeared on February 5, 2004. Almost four years later, on December 30, 2007, police unearthed his body from the floor of an uninhabited apartment building during the execution of a search warrant. The State subsequently indicted defendant with two counts of first degree murder.

¶ 3    Defendant filed a motion to suppress. During the hearing on the motion, Detective Patrick Golden testified he obtained the search warrant on December 28, 2007, and that it was premised on interviews he conducted that day with Rachael Gonzalez, defendant's girlfriend at the time of the victim's disappearance, and her father, Arturo. In her interview, Ms. Gonzalez stated that approximately four years earlier, defendant and his friend, Joseph Rodriguez, whom she identified from a photo array, dug and placed the victim's remains in a hole in the interior floor of a basement apartment at defendant's father's (Salvador Nevarez's) apartment building at 2248 W. Coulter Street in Chicago.

¶ 4    The next day, December 29, 2007, sometime between 10 a.m. and 11 a.m., Detective Golden began to execute the search warrant at 2248 W. Coulter Street, accompanied by numerous police personnel from various departments. The apartment complex consisted of two buildings. The search concentrated only on the first building, which, in turn, consisted of four rental apartments–front and rear basement apartments, and front and rear first-floor

apartments. The focal point of the search, the rear basement apartment, was a small, one-bedroom rental unit, approximately 600 square feet, with separate front and back entrances. In addition to the bedroom, the apartment contained a small kitchen and bathroom area, and a front room farther down a hallway, with a "sitting area" off to the side into which the front door opened.

¶ 5      Although Detective Golden testified that Mr. Nevarez was the owner of the apartment complex, the original search team did not gain access to the building through him. Instead, after knocking and receiving no answer, they forcibly entered the rear basement apartment through the back door sometime between 11 p.m. and 12:30 a.m.

¶ 6      Upon entering, they encountered a rental "very obvious[ly]" in rehab. There were unmounted kitchen cabinets on the kitchen floor and obvious signs of just-completed work: drywall, painting, trim, and a newly installed tile floor. There were numerous power tools, compressors, and carpentry tools. The remains of a never-installed furnace were sitting in the front room and the front door contained burn marks, presumably from someone using a blow torch to try to remove paint from the door. The bedroom contained a 6-foot by 3-foot closet, but no furniture, bed or even a sleeping bag. There were only tools and a dog cage in the bedroom.

¶ 7      Half the apartment contained a plywood subfloor, and the other half, including the bedroom and front room, had a newer-poured cement subfloor overlaid by laminate tile. Detective Golden testified that, prior to this, "it obviously was a wood-based floor through the entire apartment" that had "extensive rotting damage."

¶ 8      The original search team unsuccessfully inspected the cement floor for any indications regarding the specific location of the body. They were joined in the late afternoon by Officer Bertuca and his German shepherd named "Stitch," which was trained in cadaver retrieval (hereinafter, sometimes referred to as the cadaver dog). Officer Bertuca suggested that the search team core-drill holes in the cement to release any potential gases or odors created from the decomposition of the body, thereby facilitating Stitch's search. Thus, the rescue unit of the Chicago Fire Department (hereinafter, Rescue Unit) joined the search team in the late evening hours of December 29, 2007, and core-drilled the entire cement subfloor throughout the apartment about every foot with a high-powered drill. The process took several hours.

¶ 9      Afterward, everyone left the apartment except for Officer Bertuca and Stitch, who searched for a possible "hit" from the cement slab. Stitch went into the bedroom, lay down on all fours, stuck his snout inside one of the core-drilled holes, and stayed there. Officer Bertuca told Detective Golden that Stitch's behavior indicated the cadaver remains were somewhere in the apartment, but that it did not mean there was a body right at the spot where Stitch was lying.

¶ 10      The Rescue Unit excavated the bedroom floor for some four or five hours. The bedroom floor was "pretty thick," consisting of layers of approximately five or six inches of cement, crushed stone, and then black dirt. Additionally, the excavators also encountered and had to break through electrical conduit and PVC drain tiles under the entire cement subfloor throughout the apartment. The rescue team and the original search team used power jackhammers, picks, axes, shovels, and pry bars to excavate a trench approximately 6 feet

deep, 3 to 4 feet wide, and 6 to 10 feet in length. They moved the excavated material by "bucket brigade" from the bedroom to the front sitting area of the apartment.

¶ 11    Between 9 p.m. and 10 p.m., everyone was "pretty much physically drained." They decided to continue the search the next day. Prior to leaving, they boarded up the site and posted fully uniformed officers in two marked vehicles to guard the site. One vehicle was in back of the apartment, and the other was in front. The vehicles remained stationed there until the search team arrived the next day to continue the search.

¶ 12    Meanwhile, police located Joseph Rodriguez, defendant's friend identified by Rachael Gonzalez. They brought him to the police station at around 12 a.m. or 1 a.m. on December 30, 2009, to assist in the investigation. Detective Golden met with Mr. Rodriguez at the police station between 1 p.m. and 2 p.m. on December 30, after having dug again at the search site earlier that day. Mr. Rodriguez admitted helping defendant dig a hole into which the victim's remains were placed.

¶ 13    Between 2 p.m. and 3 p.m., Mr. Rodriguez was brought to the search site, took one look at the excavated trench in the bedroom, and said, "You're digging in the wrong spot." He went to the front room, about seven feet from the front door, four to five feet from the east wall, tapped his foot on the tile, and said, "You go down about eight feet and you'll find the body of [the victim]." This spot was only about 15 feet from the first excavation site of the previous day.

¶ 14    Thus, the Rescue Unit arrived between 4 p.m. and 5 p.m. to excavate an 8- by 10-foot trench in the front area pointed out by Mr. Rodriguez. The process required 15 to 20 people, took 3 to 5 hours, and was the same as that used in the bedroom. In addition to breaking through cement, PVC, and electrical conduit, and moving the material by bucket brigade, the team hit very foul smelling water between six to eight feet down.

¶ 15    Sometime between 9 p.m. and 10 p.m., a searcher pulled out a clump of dirt with his spade and observed blue cloth material, under which appeared to be a human bone. All digging stopped, the search site again was protected overnight by police, and the mobile crime lab and medical examiner's office arrived the next morning, December 31, 2007. Ultimately, they recovered very minute particles of clothing attached to the skeletal remains of what was later identified through dental records to be the victim. The search, from the initial forced entry on December 29, 2007, until the discovery of human remains on December 30, 2007, took approximately 36 hours.

¶ 16    On cross-examination, Detective Golden acknowledged that Stitch did not alert in the front room, where the victim actually was found, even though the Rescue Unit already had core-drilled in that room. He also acknowledged he did not include in his progress report the fact that he returned on December 30, 2007, and started digging prior to interviewing Mr. Rodriguez.

¶ 17    Detective Golden explained that, although the bedroom excavation did not produce positive results, he knew on the morning of December 30, 2007, that Stitch's "hit" meant there was a body somewhere in the apartment. This evidence was buttressed by the information from Rachael Gonzalez and her father and, further, by Mr. Rodriguez's information.

¶ 18 Defendant testified at the hearing that on December 29, 2007, he had had his own set of keys to each unit of his father's apartment building since 2002. His father had owned the building for 30 years and defendant helped him maintain and repair the building and also collected rent. Defendant collected the rent in late December 2007 because his father was in Mexico for three to four months. Defendant and his dog spent many nights in the rear basement apartment when he brought female friends there behind his girlfriend's back. There was a dog cage and there "should have been" a bed in the rental unit.

¶ 19 On cross-examination, defendant admitted he did not own the building. In fact, defendant acknowledged that, in 2007, he had his own residence at 5917 S. Neenah Avenue in Chicago, which he shared with his girlfriend. Defendant could not recall when he last spent the night at the rental unit prior to December 29, 2007. He admitted that the apartment was full of tools and other equipment, but explained on redirect examination that the tools belonged to both defendant and his father equally.

¶ 20 Following all the evidence, defense counsel argued he was not contesting the issuance or probable cause sufficiency of the search warrant. Rather, his motion was premised on the argument that probable cause dissipated after the search was suspended on the evening of December 29, 2007, and that the victim's body was discovered during a second search on December 30-31, 2007, for which an additional search warrant was required. The trial court denied defendant's motion to suppress on the basis that the discovery of the body occurred during a "continuation of the original search," explicitly finding Detective Golden to be credible and not "significantly impeached in any way."

¶ 21 The cause proceeded to a jury trial. The evidence at trial established that the victim was last seen alive by his wife, Grace Votteler, on February 5, 2004, when he left the house for work in his white Ford Ranger, wearing a white T-shirt, navy coat, and jeans. She last spoke to him sometime before noon. The victim, who reglazed bathtubs for a living, was last seen alive by his foreman at 3:30 p.m. on February 5, 2004, when he left a project at the downtown Hilton Towers.

¶ 22 The victim's best friend, Keith Maicach, last spoke to the victim via his work phone on February 5, 2004, between 12:30 p.m. and 1 p.m., and the victim said he was going to look at a painting side job south of Tinley Park for "G," identified as defendant. Both Mr. Maicach and the victim previously had bought cocaine from defendant. The victim also had painted defendant's house in the Midway airport area before.

¶ 23 An active missing persons investigation was begun by the Oak Lawn police department on February 7, 2004. On the evening of February 8, 2004, defendant called Ms. Votteler and told her that people had been calling him looking for the victim, but that he had not seen or talked to the victim. When Ms. Votteler told him that the victim's cell phone history indicated defendant had spoken with the victim on February 5, defendant said the victim had called him at work that day but defendant told him to call back later. Defendant said the victim had never called back. Defendant told Ms. Votteler that the victim was probably in the Bahamas with a girl he had met at a restaurant. Defendant also told Detective Mainwaring of the Oak Lawn police department that he had not seen the victim in several weeks.

¶ 24    On February 11, 2004, the victim's truck was found at 2514 W. Van Buren Street. When processed, not a single print was located on the outside of the truck.

¶ 25    Rachael Gonzalez testified that, in the fall of 2003, while still a high school junior at Curie High School, she moved into defendant's house at 5917 S. Neenah Avenue and lived there as his girlfriend. She knew the victim, who painted their bedroom in late 2003, and Joseph Rodriguez, through defendant. Sometime after defendant told her he suspected the victim of stealing $20,000 cash and cocaine from their bedroom, she and defendant saw a missing persons report about the victim on the news. In February 2004, defendant tearfully confessed to Ms. Gonzalez that he lured the victim to his father's house on Coulter Street, accused the victim of robbing him, shot and killed the victim, and had Joseph Rodriguez help him dig a hole and bury the victim in the basement. Defendant threatened Ms. Gonzalez that she would end up like the victim if she ever told anyone. Thus, she told no one, including the detective who interviewed her on September 10, 2004.

¶ 26    Joseph Rodriguez, defendant's close childhood friend, testified that, while at defendant's house in the winter of 2003, defendant angrily accused some man who was doing housework for them of breaking his basement window and robbing defendant of money and drugs. About a week later, defendant, who was "pretty mad," said it was weird that this same person was "passing out drugs" at a New Year's Eve party.

¶ 27    Defendant called Mr. Rodriguez sometime during the afternoon of February 5, 2004, and asked him to come to defendant's father's apartment building on Coulter Street and Western Avenue. When Mr. Rodriguez arrived, defendant led him to the rear basement apartment, which was uninhabited, had a mud/gravel floor, and smelled like a firecracker or welding, which defendant said was gunpowder. Mr. Rodriguez saw a white male on the ground leaning against the wall, whom defendant identified as "the [expletive] that stole [his] money." Mr. Rodriguez also saw a bullet shell in the hallway. Defendant threatened to kill Mr. Rodriguez unless he helped him dispose of the body.

¶ 28    Defendant handed Mr. Rodriguez a shovel and commanded him to dig in the front room, a few feet from the front entrance. Mr. Rodriguez dug a 3½- to 4-foot hole, into which defendant dumped the body, then filled it back up. Defendant again threatened to kill Mr. Rodriguez if he ever told anyone. Defendant subsequently threatened Mr. Rodriguez a third time, and then a fourth time, which kept him silent until four years after the murder.

¶ 29    Rachael Gonzalez testified she broke up with defendant in spring 2007 and moved back with her parents. Ms. Gonzalez testified that in October 2007, defendant came to her parents' house and showed her a newspaper article with a picture of the victim. Defendant demanded she move back in with him "because there were other people that helped him commit the murder and they didn't like it that [she] was at home because they were afraid that [she] was going to tell someone." In response, Ms. Gonzalez's father sent her to her cousin's house in Berwyn.

¶ 30    Rachael Gonzalez's mother, Patricia Gonzalez, testified that on October 17, 2007, defendant came to their house and admitted he "had killed a man and he can live with that, but the people that helped him bury him were getting very upset that he didn't have everything under control." Defendant told Rachael to pack her bags and come back to his

home the following morning. Instead of going back with defendant, Rachael went to a family member's house in Berwyn.

¶ 31    Rachael Gonzalez's father, Arturo Gonzalez, testified that in the fall of 2007, he had a conversation with defendant in which defendant stated he was "worried about this person he had killed." Defendant also mentioned to him that he was "worried about DNA and the size of the hole, 6 by 8, water being in the hole." Mr. Gonzalez further testified that at about 7 p.m. on December 27, 2007, he was at home when defendant came by and said he needed to talk. Mr. Gonzalez told defendant he could not talk right now because they were celebrating their daughter's, Sara's, birthday. Defendant told him to step outside. Mr. Gonzalez walked out to the porch and saw that defendant had a gun at his waist. Defendant ordered Mr. Gonzalez to get in defendant's car. Mr. Gonzalez did as he was ordered. Inside the car, defendant pointed his gun at Mr. Gonzalez and told him to get his daughter, Rachael, on the phone. When he did so, defendant told her to get "over here" or else her dad "gets it." Defendant hung up the phone and told Mr. Gonzalez that if his daughter did not come, he would shoot Mr. Gonzalez in the head, kill everyone in the house, and then burn the house down.

¶ 32    Mr. Gonzalez testified he then saw a police car in the front of the house, shining a spotlight. Defendant saw it too. As defendant looked at the police car, Mr. Gonzalez grabbed at defendant's gun and began wrestling with him. The gun went off two or three times. The car door opened and both men fell out. Defendant was arrested and Mr. Gonzalez packed up his family and went to his brother's house.

¶ 33    The police recovered a loaded .38-caliber snub-nosed revolver with three spent casings from the driver's side floor of the car, observed a bullet hole in the floorboard, and recovered a plastic bag with seven additional matching bullets in defendant's pocket. Rachael Gonzalez later spoke with police and said defendant told her where the body was buried in the apartment building on Coulter Street. The search warrant was obtained on December 28, 2007, and executed beginning the next day, December 29, 2007.

¶ 34    Detective Michael Hudziak testified he, Detective Golden, Detective McGrath, and Investigator Kolacky from the State's Attorney's office attempted to serve the search warrant by knocking on the rear door of the basement apartment. After receiving no response, they forced entry and went inside the apartment. The apartment was uninhabited, containing only garbage, tools, and miscellaneous items. The search team remained there that first day, working until approximately 10 p.m. or 11 p.m. At that point, they left for the night, handing the scene over to Chicago police officers to keep it secure.

¶ 35    The next day, December 30, 2007, after Joseph Rodriguez had shown police the exact location of the victim, holes were drilled there, the earth was agitated, and the cadaver dog came to see if he noticed any scents; he did not "hit" there. They continued to dig for another four or five hours. As Detective Hudziak was digging, he felt a soft area to the side of the hole. He "dug down a little bit around it to try to loosen [it] up a little bit and [he] felt some sort of fabric." Detective Hudziak cut through the fabric with a knife, exposing what appeared to be a human bone. Detective Hudziak stopped digging. Detective Golden secured the scene and advised that he would contact the forensic investigators.

¶ 36     Forensic investigators arrived at the search site at approximately 7 a.m. on December 31, 2007, and the medical examiner arrived later that day at approximately 1 p.m. They extracted the remains of a human skeleton and some blue fabric. Specifically, they removed two socks that contained bones, a blue coat containing the torso, and a skull. The skeleton was autopsied on January 1, 2008, and an X-ray revealed two bullet fragments in the clothing, one along the upper left chest from a gunshot wound to the left temporal bone of the skull, and one adjacent to a fracture in the left mid-shift of the humerus bone, consistent with receiving a gunshot wound. The parties stipulated that the skull of the skeleton was identified through a forensic dental examination to be that of the victim. The assistant medical examiner testified the cause of death was homicide by multiple gunshot wounds.

¶ 37     Salvador Nevarez, defendant's father, testified for the prosecution that he managed and maintained his father's (defendant's grandfather's) rental apartment building at 2248 W. Coulter Street in Chicago. He left defendant in charge on February 1, 2004, while he went on a months-long vacation. At that time, the rear basement apartment had wooden floors and Mr. Nevarez did not recall if it was occupied at that time. He did recall that the floor beams were rotten and that they began preparing in March 2007 for pouring a cement floor in there, which was done in June 2007. Defendant did not participate in the project at all.

¶ 38     Defendant testified on his own behalf that he lived with his father until he was 21, and then he bought his own house at 5917 S. Neenah Avenue. Rachael Gonzalez moved in with him at his house at 5917 S. Neenah Avenue in 2002 and assisted him in selling hydroponic marijuana grown in his basement. In the summer of 2003, defendant met Officer Jerome Finnegan, when he pulled defendant over. Officer Finnegan stated that he knew who defendant was and that defendant had been making a lot of money on Finnegan's "beat." They entered into an arrangement whereby defendant gave Officer Finnegan $3,500 per month in exchange for which Officer Finnegan would make sure defendant was not "busted." They exchanged phone calls setting up the time and place where they would meet to make the payments. Ultimately, the payments took place at 2248 W. Coulter Street.

¶ 39     Defendant explained he had access to 2248 W. Coulter Street because he had previously made copies of his father's keys so as to sneak girls to the apartment behind his girlfriend's back and without his father's knowledge. Defendant admitted he was not supposed to be at 2248 W. Coulter Street without his father's permission. Defendant testified he gave Officer Finnegan a key to the laundry room in the apartment complex at 2248 W. Coulter Street and they began to meet there in mid-late summer 2003.

¶ 40     Defendant testified that someone broke into his house at 5917 S. Neenah Avenue in January 2004 and stole weed and $40,000. Defendant reported the robbery to Officer Finnegan, because "[h]e was making sure nothing was supposed to happen to that weed." Officer Finnegan and another officer lifted what turned out to be the victim's fingerprints. In late January 2004, Officer Finnegan told defendant he just had "to get [the victim] in a certain location" like a "garage or something" to do another paint job and then Officer Finnegan would be able to get the victim to "give the money up." Defendant came up with the idea to do it at "one of the apartments, [because] one of the apartments was vacant at that time. It was in rehab so-to-speak."

¶ 41    Defendant testified Rachael Gonzalez called the victim and arranged for him to come to the apartment complex at 2248 W. Coulter Street. Defendant and Ms. Gonzalez met the victim there at 6 p.m. on February 5, 2004. Defendant and Ms. Gonzalez walked him inside. Officer Finnegan arrived too, went inside, and told defendant and Ms. Gonzalez to step outside. After they went outside, defendant heard Officer Finnegan shouting and then heard three loud gunshots. Defendant went inside and saw the victim lying on the ground. Officer Finnegan ordered defendant to bury the victim. Defendant called Joseph Rodriguez, who came and dug the grave and buried the victim.

¶ 42    Defendant testified that on October 2, 2007, he read in the Chicago Sun Times that Officer Finnegan had been charged with armed robbery as well as other crimes. He showed the article to Ms. Gonzalez, who "freaked out" and went to her mom's house. On October 15, 2007, defendant showed Ms. Gonzalez and her mother another newspaper article, which said that Officer Finnegan had been taped by an undercover officer saying he had to "do a paint job" on four witnesses against him. Defendant tried to convince Ms. Gonzalez to come home with him so that Officer Finnegan would not think of her as a "liability," but Ms. Gonzalez "took off" instead.

¶ 43    Defendant testified that on December 27, 2007, he went to the Gonzalez home to bring Sara a birthday present. When he went outside and into his car at Mr. Gonzalez's invitation, Mr. Gonzalez pulled a .38-caliber gun on defendant because he was angry defendant had gotten his family involved with a dirty cop. They struggled, the gun went off three times, they fell out of the car, and the police came and arrested them.

¶ 44    At the close of all the evidence, the jury convicted defendant of first degree murder and the trial court sentenced him to 60 years' imprisonment, plus an additional 25 years for personally discharging the firearm that caused the victim's death. The trial court denied defendant's posttrial and postsentencing motions. Defendant filed this timely appeal.

¶ 45    First, defendant contends the trial court erred by denying his motion to suppress because the search of the bedroom apartment violated the fourth amendment. The reviewing court accords great deference to the circuit court's factual findings and credibility determinations on a motion to suppress and will reverse those findings only if they are against the manifest weight of the evidence. *People v. Richardson*, 234 Ill. 2d 233, 251 (2009). "This deferential standard of review is grounded in the reality that the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." *Id*. However, the reviewing court reviews *de novo* the ultimate question of defendant's legal challenge to the denial of his motion to suppress. *Id*.

¶ 46    The fourth amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. The fourth amendment generally requires a warrant supported by probable cause. *People v. Moss*, 217 Ill. 2d 511, 518 (2005). As in the trial court, defendant here is not contesting the issuance or probable cause determination of the search warrant. Rather, defendant argues that probable cause dissipated after the search was suspended on the evening of December 29, 2007, and that the victim's body was discovered during a second search on December 30, 2007, for which an additional search

warrant was required.

¶ 47 We disagree. As discussed above, Detective Golden obtained the search warrant on December 28, 2007, and it was premised on interviews he conducted that day with defendant's former girlfriend, Ms. Gonzalez, and her father. Ms. Gonzalez stated that four years earlier, defendant and Joseph Rodriguez buried the victim's remains in a hole in the interior floor of a basement apartment at defendant's father's apartment building at 2248 W. Coulter Street. The next day, December 29, 2007, Detective Golden executed the search warrant. The focal point of the search was the rear basement apartment in the first building. The search team unsuccessfully inspected the cement floor for indications regarding the specific location of the body. To facilitate the search, the Rescue Unit core-drilled holes to release any potential gases or odors. The process took several hours. Then the cadaver dog, Stitch, "hit" on one of the holes, meaning the cadaver remains were somewhere in the apartment. After four or five more hours of excavation, everyone was "physically drained" according to Detective Golden. A police guard was posted at the apartment and the search team left for the night. The next day, Detective Golden met with Joseph Rodriguez, who admitted his involvement in the victim's burial. Between 2 p.m. and 3 p.m. on December 30, 2009, Mr. Rodriguez was brought to the search site and pointed out the exact spot where they had buried the victim. After several more hours of searching at this spot, the search team uncovered human remains.

¶ 48 This record indicates that the search team proceeded with diligence on the first day of the search, uncovered evidence (the cadaver dog's "hit") that the body was indeed somewhere in the apartment, but was unable to complete the search that day because the long process of excavation had physically drained the searchers. They left for the night, but demonstrated their intent to continue the search the next day by boarding up the site and posting overnight police guards at both entrances. As the search could not have been completed in a single day, the resumption of the search the next day was not a separate search requiring a second warrant, but was simply a reasonable continuation of the original search for which no new search warrant was required. See *United States v. Squillacote*, 221 F.3d 542, 557 (4th Cir. 2000) (where search could not have been completed in a single day, "the subsequent entries were not separate searches requiring separate warrants, but instead were simply reasonable continuations of the original search").

¶ 49 The fact that Detective Golden spoke with Mr. Rodriguez between the first and second searches, and that Mr. Rodriguez pinpointed the location of the body for the searchers on the second day, does not compel a finding that Mr. Rodriguez's statements should have been presented to a judge in support of a new search warrant. Defendant's argument that Detective Golden should have presented Mr. Rodriguez's statements to a judge is premised on the contention that the probable cause for the search had dissipated when the search team left the first night without uncovering the body and that Mr. Rodriguez's statements were necessary to establish the probable cause for the subsequent search. We disagree. As discussed, on the first day of the search, the cadaver dog hit on one of the holes dug in the cement floor, indicating that a body was in fact buried somewhere in the apartment. Thus, contrary to defendant's argument, probable cause had not dissipated when the search was suspended that first evening due to physical exhaustion; rather, the cadaver dog's hit *enhanced* the probable

cause by corroborating the information provided by Ms. Gonzalez and her father to Detective Golden. As probable cause for the search had not dissipated, Detective Golden was not required to incorporate Mr. Rodriguez's statement in an affidavit for a second search warrant. The initial search warrant remained in effect, the search on the second day constituted a reasonable continuation of the initial search, and there was no fourth amendment violation here.

¶ 50　　We also affirm the denial of the motion to suppress because defendant failed to establish a legitimate expectation of privacy in the basement apartment to permit him to contest the search. Our supreme court has held that to claim the protection of the fourth amendment, a defendant must demonstrate he personally has an expectation of privacy in the place searched and that his expectation is reasonable. *People v. Rosenberg*, 213 Ill. 2d 69, 77 (2004). "Whether one has a legitimate expectation of privacy in an area searched is measured by an objective standard drawn from common experience." *Id*. at 78.

¶ 51　　The supreme court has identified the following factors to be considered in determining whether defendant has a legitimate expectation of privacy in the place searched or the property seized: "(1) property ownership, (2) whether the defendant was legitimately present in the area searched, (3) the defendant's possessory interest in the area searched or the property seized, (4) prior use of the area searched or property seized, (5) ability to control or exclude others' use of the property, and (6) a subjective expectation of privacy in the property." *Id*. Defendant bears the burden of establishing his legitimate expectation of privacy that was violated by the challenged search. *Id*.

¶ 52　　In the present case, defendant did not own the apartment building or rent the basement apartment at the time of the search; the building was owned by defendant's grandfather and managed by defendant's father, and the basement apartment was vacant and undergoing extensive repairs. Although defendant had previously helped collect rent when his father was in Mexico, and claimed to have performed some repairs and stored tools in the basement apartment, he had no possessory interest in the area searched. See *People v. Rios*, 278 Ill. App. 3d 1013, 1016 (1996) ("We believe that storing required tools at a worksite until the work is completed and making telephone calls is insufficient to vest the defendants with a possessory interest in the worksite."). Also, defendant's use of the basement apartment for romantic trysts was without his father's permission and afforded him no possessory interest or legitimate expectation of privacy. See *United States v. Battle*, 637 F.3d 44, 49 (1st Cir. 2011) ("A defendant lacks a legitimate expectation of privacy in a place *** when he does not have permission to be present."). In addition, there is no evidence in the record that defendant had any ability to control or exclude others' use of the apartment. On these facts, defendant had no objectively reasonable expectation of privacy in the area searched, and therefore he may not claim the protection of the fourth amendment. We affirm the denial of defendant's motion to suppress.

¶ 53　　Next, defendant contends the trial court erred by denying his sixth amendment right to be represented by his counsel of choice. The sixth amendment guarantees that, in all criminal prosecutions, the accused shall have the right to assistance of counsel. U.S. Const., amend. VI. This right assures fairness in the adversary criminal process and encompasses both the right to effective representation by competent counsel and the right to select and be

-11-

represented by one's preferred attorney. *People v. Holmes*, 141 Ill. 2d 204, 217 (1990). However, the sixth amendment right to counsel is not absolute and may be limited in important respects, including the disqualification of counsel where an actual conflict of interest, or a serious potential for conflict, exists. *Id*.; *People v. Ortega*, 209 Ill. 2d 354, 361 (2004). A trial court has "substantial latitude" to refuse to allow defendant's waiver of his chosen counsel's actual or potential conflict of interest. *Wheat v. United States*, 486 U.S. 153, 163 (1988). "Trial courts need latitude because they must decide whether to accept a proffered waiver before trial, when the 'likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials.' " *Ortega*, 209 Ill. 2d at 358-59 (quoting *Wheat*, 486 U.S. at 162-63). We will not set aside the trial court's decision to disqualify defendant's chosen counsel unless there has been a clear abuse of discretion. *Ortega*, 209 Ill. 2d at 359. "Generally, a court abuses its discretion when its decision is fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." *Id*.

¶ 54    Defendant initially had been represented by Sam Adam, Jr. (hereinafter, Junior), and Stuart Goldberg. On May 22, 2009, Sam Adam, Sr. (hereinafter, Senior), filed a motion for leave to file his appearance as defendant's counsel. The motion acknowledged that sometime in 2008, Senior had represented Salvador Nevarez, the father of defendant, on a single occasion when he was interviewed by an assistant State's Attorney. The motion asserted that nothing incriminating as to either defendant or Mr. Nevarez resulted from that single interview. The motion further stated that Mr. Nevarez had no objection to Senior's proposed representation of defendant. Senior attached to the motion Mr. Nevarez's signed, written waiver of any conflicts of interest arising from Senior's prior representation of him. Senior also attached defendant's unsigned waiver of any conflicts of interest arising from Senior's prior representation of Mr. Nevarez.

¶ 55    The State filed a motion to disqualify Senior from representing defendant. In the motion to disqualify, the State asserted that on January 16, 2008, Mr. Nevarez appeared at the State's Attorney's office pursuant to being served with a grand jury subpoena issued as part of the ongoing investigation into the victim's murder. Senior represented Mr. Nevarez and appeared with him. Mr. Nevarez, Senior, and the People negotiated and executed a "Use Immunity Agreement" for any information Mr. Nevarez provided that related to the offense of concealment of a homicide. Mr. Nevarez then submitted to an interview with prosecutors and detectives. Senior was present for the entire interview. Mr. Nevarez answered questions about his and his family's ownership of 2248 W. Coulter Street, the maintenance of that building, and the access that defendant had to the building in 2004. Mr. Nevarez did not testify before the grand jury.

¶ 56    The State further asserted in its motion to disqualify that on January 23, 2008, Alonzo Nevarez, defendant's brother, appeared at the State's Attorney's office pursuant to being served with a grand jury subpoena issued as part of the investigation into the victim's murder. Senior represented Alonzo and appeared with him. Alonzo, Senior, and the People negotiated and executed a "Use Immunity Agreement" for any information Alonzo provided relating to the offense of concealment of a homicide or criminal offenses relating to running credit checks. Alonzo then submitted to an interview with prosecutors and detectives. Senior

was present for the entire interview. Alonzo answered questions concerning his knowledge of the victim, his access to 2248 W. Coulter Street, and his knowledge of Rachael Gonzalez and Joseph Rodriguez. Alonzo did not testify before the grand jury.

¶ 57    The State asserted that it anticipated calling Salvador Nevarez as a witness in its case-in-chief and that there was the "possibility" Alonzo Nevarez could be called as a rebuttal witness. The State noted it had included both names as possible trial witnesses in its answer to discovery filed with the court on February 26, 2009.

¶ 58    In support of its motion to disqualify, the State cited *People v. Holmes*, 141 Ill. 2d 204 (1990), in which the supreme court considered whether a defense attorney could be removed from a case against the defendant's wishes where the attorney had a conflict of interest. The *Holmes* court stated that the trial court must recognize a presumption in favor of defendant's counsel of choice. *Id*. at 223. The *Holmes* court further identified four factors the trial court should consider in determining whether the interests threatened by the conflict or potential conflict are weighty enough to overcome the presumption: (1) defendant's right to undivided loyalty from his counsel; (2) the State's right to a fair trial in which defense counsel acts ethically and does not use confidential information to attack a State witness; (3) the appearance of impropriety should the jury learn of the conflict; and (4) the probability that continued representation by counsel of choice will provide grounds for overturning a conviction on appeal. *Id*. at 226-27. In its motion to disqualify, the State argued that, under *Holmes*, defendant's right to Senior as his counsel of choice was outweighed by the interests threatened by the conflict. Specifically, the State first argued that Senior's loyalty would be split between his representation of defendant and his representation of the prosecution witnesses, Salvador and Alonzo Nevarez. Second, the State argued its interest in a fair trial was a substantial interest that should be assigned "substantial weight in this case." Third, the State argued that Senior's prior representation of Salvador Nevarez forseeably could come to light during his testimony, creating an appearance of impropriety to the members of the jury. Fourth, the State argued that if the court accepted defendant's waiver of conflict-free counsel and he was convicted, he would be able to appeal asserting an ineffective assistance of counsel claim against Senior.

¶ 59    The State further asserted, "[a]n additional basis for the disqualification of [Senior] is his role as a witness to statements made by Salvador and Alonzo Nevarez. Should Salvador Nevarez's testimony be impeached in any way, [Senior] would be the only witness available to rehabilitate his testimony (as a live witness or through stipulation). His representation of defendant would preclude him from being called as a witness or even mentioned as a witness in a stipulation. Therefore, defendant would be refrained from presenting an effective defense if [Senior] is representing him."

¶ 60    After hearing arguments on the motion, the trial court expressly considered the *Holmes* factors, as well as a fifth factor identified by the supreme court in *Ortega*, 209 Ill. 2d at 362, specifically, whether the State legitimately needed to call the witness who creates a conflict or whether the State was manufacturing a conflict to prevent defendant " 'from having a particularly able defense counsel at his side.' " *Id*. (quoting *Wheat*, 486 U.S. at 163). The trial court stated for the record:

"[I]n this case, I don't think it's appropriate for the court to rule [that the State does not have a need to call Salvador Nevarez]. *** I think there's a chance, and not a significant one, that the jury will learn that [Senior] represented the father of the defendant and particularly in regard to this particular investigation. I think there's a significance [*sic*] chance of that. Again, I don't know how the testimony is going to go, which direction the trial is going to take, but I think there's a significant chance of that.

I have the greatest respect for counsel for both sides actually, and I don't think [Senior] would do anything unethical intentionally, but I have concerns about this representation of the State's witness, particularly in connection with the case, the events that are actually the form of the subject matter at trial. I don't think it looks very good, frankly. I think it puts you in a very precarious situation.

In regard to the possibility of your continued representation providing some grounds for overturning the conviction, I don't know about that. That's something that's way too speculative for me to engage in. But I think in balancing these five factors, I think particularly since he's already represented by two counsels, I think the balance would have to go to the State.

I think that the appearance of impropriety is too great should the jury learn of it, and I think it places you in a very difficult position even if you are not cross-examining the witness. I just don't see how you can do that. So your motion to file an appearance is denied."

Junior and Stuart Goldberg continued to represent defendant.

¶ 61    Thus, the trial court determined a serious potential for conflict arose from Senior's prior representation of State witness Salvador Nevarez in connection with the investigation of the victim's murder. The trial court carefully balanced the five *Holmes* and *Ortega* factors and determined that the interests threatened by the potential conflict were weighty enough to overcome the presumption in favor of defendant's counsel of choice. A reasonable person could conclude, as did the trial court, that the appearance of impropriety would be too great if the jury learned Senior had been allowed to represent both a prosecution witness and defendant in connection with the same case. Accordingly, the trial court committed no clear abuse of discretion in so ruling. We affirm the denial of Senior's motion for leave to file his appearance as defendant's counsel.

¶ 62    Next, defendant contends his 25-year sentence enhancement for personally discharging the firearm that proximately caused the victim's death (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2010)) violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because "it was not pled in the indictment." In *Apprendi*, the United States Supreme Court held "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. The Illinois Supreme Court has noted "[t]he *Apprendi* rule does not address the charging instrument" (*People v. Robinson*, 232 Ill. 2d 98, 110 (2008)) and has explained:

"[T]he Supreme Court in *Apprendi* specifically declined to address the indictment question. [Citation.] The Court noted that the defendant *** did not assert a constitutional claim based upon the indictment's failure to charge the sentence-

enhancement factors. Instead, the defendant relied upon the due process clause of the fourteenth amendment, which the Court stated has never been construed to make the fifth amendment right to 'presentment or indictment of a Grand Jury' applicable to the states. [Citation.] Indeed, *Apprendi*'s central holding [citation] makes no mention of any indictment right. Instead, as previously noted, it focuses upon the rights to trial by jury and proof beyond a reasonable doubt. We therefore reject defendant's argument that *Apprendi* requires 'notice of the sentence-enhancing facts.' " *People v. Thurow*, 203 Ill. 2d 352, 366-67 (2003).

¶ 63    Thus, contrary to defendant's argument, *Apprendi* does not require that the sentence-enhancing facts (defendant's personal discharge of the firearm proximately causing the victim's death) be pled in the indictment.

¶ 64    We note that section 111-3(c-5) of the Code of Criminal Procedure of 1963 provides in pertinent part that "[n]otwithstanding any other provision of law, in all cases in which the imposition of the death penalty is not a possibility, if an alleged fact (other than the fact of a prior conviction) is not an element of an offense but is sought to be used to increase the range of penalties for the offense beyond the statutory maximum that could otherwise be imposed for the offense, the alleged fact must be included in the charging instrument *or otherwise provided to the defendant through a written notification before trial*, submitted to a trier of fact as an aggravating factor, and proved beyond a reasonable doubt." (Emphasis added.) 725 ILCS 5/111-3(c-5) (West 2010). The record contains the State's written notification of its intent to seek an extended term pursuant to section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(i)(d)(iii) (West 2010)); accordingly, the State complied with its statutory notice obligations.

¶ 65    We further note that the sentence-enhancing facts would only have to be pled in the indictment if they created a distinct crime. In the case at bar, defendant was charged with first degree murder. Our supreme court has held "first degree murder is a single offense–there is no separate offense of 'armed murder' or 'enhanced murder.' " *People v. White*, 2011 IL 109616, ¶ 26. Accordingly, the sentence-enhancing facts need not be pled in the indictment.

¶ 66    Defendant next argues that the State failed to prove the sentence-enhancing elements beyond a reasonable doubt, as required by *Apprendi*, because "there was no evidence at trial as to the identity of the shooter." Since this argument constitutes a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution and consider whether any rational trier of fact could have found that defendant was the shooter. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). See *People v. Kaszuba*, 375 Ill. App. 3d 262, 266 (2007) (utilizing the *Jackson* standard when addressing the defendant's argument that the State failed to prove beyond a reasonable doubt that he personally discharged a firearm that proximately caused the victim's death.) Rachael Gonzalez testified at trial that defendant confessed to her in February 2004 that he lured the victim to 2248 W. Coulter Street, accused the victim of robbing him, "*shot* and killed" the victim, and had Joseph Rodriguez help him dig a hole and bury the victim in the basement. (Emphasis added.) Ms. Gonzalez's testimony was corroborated in large part by her mother and father, who each testified that defendant had confessed to killing someone. Ms. Gonzalez's testimony also was corroborated by Joseph Rodriguez, who testified that on February 5,

2004, defendant called him and asked him to come to 2248 W. Coulter Street. When Mr. Rodriguez arrived, defendant led him to the rear basement apartment, where Mr. Rodriguez smelled something like a firecracker or welding, which defendant said was gunpowder. Defendant saw a white male on the ground leaning against the wall, whom defendant identified as "the [expletive] that stole [his] money." Mr. Rodriguez saw a bullet shell in the hallway. On defendant's order, Mr. Rodriguez dug the hole and afterwards saw defendant dump the body inside. In addition, the assistant medical examiner testified the victim's cause of death was homicide by multiple gunshot wounds. Viewing all this evidence in the light most favorable to the State, any rational trier of fact could find that defendant personally discharged a firearm that proximately caused the victim's death. Accordingly, the 25-year sentence enhancement did not violate *Apprendi*.

¶ 67      For the foregoing reasons, we affirm the circuit court.

¶ 68      Affirmed.