# Illinois Official Reports

## Appellate Court

---

### *People v. Buckhanan*, 2017 IL App (1st) 131097

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRYANT BUCKHANAN, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-13-1097 |
| Filed | February 7, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-3237; the Hon. Lawrence E. Flood and the Hon. Dennis J. Porter, Judges, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Michael H. Orenstein, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, Janet C. Mahoney, and Brian A. Levitsky, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Justices Lavin and Pucinski concurred in the judgment and opinion. |

## OPINION

¶ 1 For six years prior to 2009, Samuel E. Adam, Jr. (Junior) had represented defendant Bryant Buckhanan on a number of criminal matters. On January 11, 2008, the State filed a complaint (later superseded by indictment) charging Buckhanan with the August 19, 2007, murder of Omari Houston. On the same date the complaint was filed, Junior filed an appearance on Buckhanan's behalf.[1]

¶ 2 More than a year and a half later, the State sought to disqualify Junior from representing Buckhanan on the ground that Junior's father, Samuel F. Adam, Sr. (Senior), represented Gabrielle Gambrell, Buckhanan's girlfriend and a witness the State planned to call at trial. The conflict identified by the State in its motion was the possibility that if Gambrell's trial testimony varied from a statement she made to the police in September 2007, the State would call Senior—who was present for the statement—to impeach his client. Notwithstanding the fact that (i) there were other witnesses to Gambrell's statement, namely, a police detective and an assistant State's Attorney, thus clearly rendering Senior's testimony unnecessary and (ii) the State identified no material variance between Gambrell's statement and her grand jury testimony, the trial court ordered a hearing on the State's motion.

¶ 3 After the hearing, during which Senior testified that he did not recall Gambrell making one of the statements attributed to her in the summary of her statement to the police (so that he would, therefore, not impeach Gambrell on that point), the State changed tack and argued that Junior would be obligated to call his father as a witness in Buckhanan's defense (presumably to attest to his lack of recall of a portion of Gambrell's statement) or be deemed ineffective for failing to do so. Without articulating any actual or potential "conflict" inherent in this new scenario, the State argued that the possibility of Junior calling Senior as a witness created the appearance of impropriety justifying Junior's disqualification.

¶ 4 The trial court agreed and granted the State's motion. In the course of its ruling, the trial court specifically found that there was no unethical exchange of confidential information between Senior and Junior.

¶ 5 We reverse the disqualification of Buckhanan's counsel and remand for a new trial. Nothing in the State's theory of disqualification, either as originally articulated or as revised after the hearing, warranted depriving Buckhanan of his chosen counsel. And although the State's evidence was more than sufficient to sustain Buckhanan's conviction, the error in disqualifying his attorney, standing alone, mandates reversal of the circuit court's judgment and remand for a new trial.

## BACKGROUND

¶ 7 Almost immediately after Houston's murder, police focused on Buckhanan given that several witnesses implicated him in the murder and identified him in a photo array. Buckhanan's loaner car from an automobile dealership—also identified by several witnesses as being present at the scene of the murder—was found in a ditch the day after the murder with papers identifying Buckhanan and the keys still in the ignition.

---

[1]Judge Flood presided over the hearing on the State's motion for disqualification. Judge Porter presided over the trial.

¶ 8        The police had several addresses where they searched for Buckhanan after the murder, including an apartment in Woodridge where he resided with Gambrell and their infant child. After Gambrell felt the police were harassing her, she eventually contacted Senior in September 2007, and he agreed to represent her. Gambrell did not witness the shooting; rather, the State intended to call her to establish Buckhanan's flight the day after the murder. Gambrell's anticipated testimony was based on a statement she gave to police on September 12, 2007, and testimony she gave before a grand jury on February 5, 2008, after Buckhanan's arrest.

¶ 9        In her 2007 statement to police, which police later summarized, Gambrell stated that on the morning after the shooting, she received a phone call from Buckhanan informing her that someone had run his car into a ditch on I-88. Gambrell, who was not at home when she received Buckhanan's call, returned to the apartment and, on the way, drove down I-88 and determined that Buckhanan's car was no longer in the ditch. She then met Buckhanan briefly at their apartment. According to the summary, Buckhanan informed Gambrell that he had called the Illinois State Police about the loaner vehicle, and they told him to contact homicide detectives. A short time later, Buckhanan left without telling Gambrell where he was going. Gambrell met with and spoke to Buckhanan after August 18, but he did not return to their apartment before his arrest.

¶ 10       There is no indication in the record that Gambrell was shown the summary of her statement or asked to sign or initial it. The summary concludes with the statement that after the interview was completed, the assistant State's Attorney who was present decided not to call Gambrell before the grand jury.

¶ 11       Buckhanan was apprehended by police in connection with Houston's murder on January 9, 2008. As noted, Junior filed his appearance for Buckhanan on January 11, 2008.

¶ 12       The State did ultimately summon Gambrell to testify before the grand jury and her February 2008 testimony was substantially similar to her statement to the police, except that when she was asked whether Buckhanan told her "he had received a call from the State Police," Gambrell testified that she did not recall him saying that. Further, when asked if Buckhanan told her the Chicago police were looking for him, Gambrell responded, "I don't remember if he told me right then. I don't remember. I mean I knew later, but I don't remember if he told me at that point." In her grand jury testimony, Gambrell was not asked whether Buckhanan told her (1) he had called the Illinois State Police and (2) the Illinois State Police told him to contact homicide detectives.

¶ 13       The State hoped that Gambrell would testify consistently with her 2007 police statement. In particular, they wanted her to say that Buckhanan had been told to contact homicide detectives, to show that Buckhanan knew the police were looking for him in regards to a murder investigation.

¶ 14       The State's motion to disqualify was filed on September 30, 2009. At the time the motion was filed, trial was scheduled to commence three weeks later on October 19, 2009. In its motion, the State represented that in the event Gambrell denied that Buckhanan told her the Illinois State Police advised him to contact homicide detectives, the State would "possibly" call Senior to impeach her—thus opening the door for the jury to find out that defense counsel's father represented a witness for the State.

¶ 15       The State argued that Junior should be disqualified for two reasons: first, it asserted that, through his father, Junior had access to confidential information about Gambrell that would

give the defense an unfair advantage; second, it argued that if the jury learned Junior's father represented a State witness, it would create an appearance of impropriety. The State admitted that it had been aware that Junior was representing Buckhanan since August 19, 2007 (the day of the murder), when Junior called Area 4 and informed a detective that he was Buckhanan's attorney. The State was also aware that Senior was representing Gambrell no later than September 12, 2007, since he accompanied her when she made her statement to the police.

¶ 16    Junior filed a response to the State's motion to disqualify in which he stated that both he and his father were solo practitioners and had never worked in partnership with each other; additionally, Senior never disclosed to him any confidential information regarding Gambrell. Junior also challenged the basis for the State's disqualification motion by pointing out that Gambrell's statement to police was not inconsistent with her grand jury testimony. Furthermore, Junior stated that he had represented Buckhanan in the current action for over two years (measured from the date Junior first informed police he was representing Buckhanan), and he had a relationship with Buckhanan for over six years, during which he represented him in various other criminal cases. Buckhanan wished to keep him as counsel and waived any conflict that might arise from Junior's continued representation. Both Junior and Buckhanan signed the response to the State's motion.

¶ 17    At the hearing on the motion for disqualification, Buckhanan formally waived any conflict of interest. Senior, the only witness, testified that he and his son were solo practitioners, although they were serving as cocounsel for defendants in three ongoing (and unrelated) criminal cases. He and Junior shared an office at 6133 South Ellis Avenue along with six other attorneys. In 2007, Senior's primary office was at 53 West Jackson Boulevard, but he would sometimes meet clients at his son's 6133 South Ellis Avenue office.

¶ 18    Senior testified that he had never represented Buckhanan on any civil or criminal matters. Although he was not Buckhanan's attorney, on multiple occasions he appeared in Buckhanan's case to ask for continuances when Junior was unavailable. On those occasions, Senior also talked to Buckhanan's family to explain why Junior could not appear.

¶ 19    In September 2007, a relative or friend called Senior on Gambrell's behalf. During that phone conversation, Gambrell got on the phone and told Senior that police were harassing her and she was afraid to go home. Senior arranged for Gambrell to meet him at Junior's office. When Gambrell arrived, Junior was present; he recognized Gambrell and said, "I can't talk to her." Senior spoke with Gambrell in private, out of Junior's presence, and agreed to represent her. Shortly thereafter, Senior contacted the police department to state that he was representing Gambrell and she did not wish to speak to any officers in connection with their investigation.

¶ 20    On September 12, 2007, Gambrell was summoned to the courthouse, where Senior allowed her to speak to police in his presence. Senior testified that the police report of the meeting was mostly correct, but he did not recall Gambrell making one specific statement in the report that the State wanted to elicit at trial (*i.e.*, that Buckhanan told Gambrell that he had called the Illinois State Police about his car and they told him to contact homicide detectives).

¶ 21    Buckhanan was not apprehended until January 9, 2008. A month later, on February 5, 2008, Gambrell testified before a grand jury, again in Senior's presence. After Gambrell's grand jury testimony, Senior's contact with her was limited to one or two phone calls, as well as seeing her in the courtroom on "several dates" when he was continuing Buckhanan's case. But pursuant to their agreement, Senior was still her attorney.

¶ 22    Senior denied disclosing to Junior any confidential information regarding Gambrell. He admitted that after Gambrell gave her statement to police on September 12, 2007, Senior "briefly" told Junior the contents of that statement. Also, after Gambrell testified before the grand jury on February 5, 2008, Senior told Junior that she said "substantially what she had said before the assistant State's attorney," though he never laid out the specifics of her testimony.

¶ 23    During argument on the motion, the State represented to the court that Gambrell's disputed statement in the 2007 police report was significant because it showed that Buckhanan knew he was wanted in connection with a homicide investigation. It contended that if Gambrell denied her statement, then "[c]learly, the State has to call the State's Attorney as a witness" to impeach her. In that case, Junior would likely want to call Senior to the stand to "rehabilitate" Gambrell. In fact, the State said that Junior would *have* to call Senior, since failure to do so would be ineffective assistance of counsel. Junior, for his part, noted that the State had reversed its position on Senior's testimony since it filed its disqualification motion: initially, the State said that *it* might call Senior, but now, it said that *Junior* might call Senior. Junior argued that this change of position was evidence that the State brought the disqualification motion in bad faith. The trial court disagreed, saying that it was a reasonable change in light of Senior's testimony that he did not recall Gambrell making that statement.

¶ 24    The trial court granted the State's motion to disqualify Junior as Buckhanan's attorney. In doing so, it agreed with the State's assertion that Gambrell's disputed statement was probative as to Buckhanan's state of mind. Based on the possibility that Junior would call Senior to testify regarding that statement, the court believed there was a serious potential for conflict. The court found that Junior's continued representation of Buckhanan could impact the State's right to a fair trial, since he could potentially access confidential information about Gambrell that would give the defense an unfair advantage. It also found that there was a risk of the appearance of impropriety if the jury were to find out that the father of the defendant's lawyer represented one of the State's witnesses. But the court also stated: "I must emphasize that in indicating this, I am not *** indicating at all that anything that was done by Mr. Sam Adam Jr. or Sam Adam Sr. was any way unethical. This is a question of the appearance of impropriety." Additionally, the court found that there was no indication of overreaching or bad faith on the part of the State.

¶ 25                                    ANALYSIS

¶ 26    The sixth amendment provides that a defendant in a criminal prosecution has a right to the assistance of counsel. U.S. Const., amend. VI. As part of this right, there is a presumption in favor of defendant's counsel of choice. *People v. Holmes*, 141 Ill. 2d 204, 223 (1990) (quoting *Wheat v. United States*, 486 U.S. 153, 164 (1988)); see also *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006) (the sixth amendment "commands *** that the accused be defended by the counsel he believes to be best"). But this presumption may be overcome if the State proves that there is either an actual conflict of interest or a serious potential for conflict. *Wheat*, 486 U.S. at 164; *Rodriguez v. Chandler*, 382 F.3d 670, 672 (7th Cir. 2004) (burden of proof lies with State).

¶ 27    In Illinois, a two-part test governs State challenges to the defendant's counsel of choice. First, the court must determine whether defense counsel has "a specific professional obligation that actually does conflict or has a serious potential to conflict with defendant's interests."

- 5 -

*People v. Ortega*, 209 Ill. 2d 354, 361 (2004). If the answer is yes, then the court must determine whether the interests threatened by that conflict are weighty enough to overcome the presumption in favor of defendant's counsel of choice. *Id.* In weighing the interests, courts consider the likelihood that a conflict will actually occur, since "a conflict that would seriously undermine counsel's effectiveness is not a basis for disqualification if it has little likelihood of occurring." *United States v. Turner*, 594 F.3d 946, 952 (7th Cir. 2010). Courts also frequently consider

> "(1) the defendant's interest in having the undivided loyalty of counsel; (2) the State's right to a fair trial in which defense counsel acts ethically and does not use confidential information to attack a State's witness; (3) the appearance of impropriety should the jury learn of the conflict; (4) the probability that continued representation by counsel of choice will provide grounds for overturning a conviction." *Ortega*, 209 Ill. 2d at 361-62.

Furthermore, where appropriate, the court should consider whether there are alternatives to disqualification that would remove the conflict while still protecting defendant's right to counsel. *Turner*, 594 F.3d at 952. We review the trial court's decision to disqualify counsel for an abuse of discretion, keeping in mind that trial courts need " 'substantial latitude' " in making such decisions because it is not always apparent before trial whether and in what ways a conflict might arise. *Ortega*, 209 Ill. 2d at 358 (quoting *Wheat*, 486 U.S. at 163).

¶ 28 Our first question is whether the trial court could reasonably have found at least a serious potential for conflict arising from Junior's representation of Buckhanan. Buckhanan argues that there was no potential for conflict, since Junior and Senior are both sole practitioners. The State contends that, although they are not formally associated in a firm, their professional relationship is close enough that they can be considered members of the same firm for conflicts purposes. Although it made no express finding on the point, the trial court apparently agreed.

¶ 29 Rule 1.10(a) of the Illinois Rules of Professional Conduct states, in relevant part, "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so ***." Ill. R. Prof'l Conduct (2010) R. 1.10(a) (eff. Jan. 1, 2010). Comment 2 to Rule 1.0 elaborates on what it means for lawyers to be "in a firm":

> "Whether two or more lawyers constitute a firm *** can depend on the specific facts. For example, two practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a firm. However, if they present themselves to the public in a way that suggests that they are a firm or conduct themselves as a firm, they should be regarded as a firm for purposes of the Rules. The terms of any formal agreement between associated lawyers are relevant in determining whether they are a firm, as is the fact that they have mutual access to information concerning the clients they serve." Ill. R. Prof'l Conduct (2010) R. 1.0, cmt. 2 (eff. Jan. 1, 2016).

Although Senior and Junior were not formally associated in a law firm, it is at least arguable that they constitute a firm under Rule 1.0, given their closeness of their professional relationship. They acted as cocounsel in various criminal matters, shared office space, and Senior covered for Junior in a number of court appearances in this case. But even if we assume, for the sake of argument, that their relationship could give rise to some potential for conflict, we find that the interests threatened by that potential for conflict are not enough to overcome

the constitutional presumption in favor of Buckhanan's counsel of choice. *Ortega*, 209 Ill. 2d at 361.

¶ 30    The parties agree that Buckhanan's interest in having the undivided loyalty of counsel is not implicated here, since Buckhanan waived any conflict. The State nevertheless argues that disqualification was necessary for two reasons: first, that exchange of confidential information between Senior and Junior could give the defense an unfair advantage; and second, that there was a purported inconsistency between Gambrell's statement to police and her grand jury testimony, which *might* indicate that she would recant the former at trial, which *might* lead the parties to call Senior to either impeach or rehabilitate her, and which *might* create an appearance of impropriety in the eyes of the jury. But the first of these reasons was soundly refuted by Senior's testimony and the trial court's findings, while the second was groundless from its inception, since Gambrell's statements did not actually contradict each other. Thus, the entire basis of the State's argument is meritless.

¶ 31    We note at the outset that the timing of the disqualification motion calls into question its *bona fides*. The State had been aware since September 2007 that Gambrell was a potential witness and was represented by Senior. Junior informed police that he was representing Buckhanan on August 19, 2007, and he filed his appearance for Buckhanan in January 2008. If the State was truly concerned that Gambrell would "recant" her statement to the police based on her grand jury testimony, that would have been obvious by February 2008. On July 30, 2009, the parties agreed to a trial date of October 19, 2009; the State did not move to disqualify Junior until September 30, less than one month before the scheduled trial. If the State had concerns about a potential conflict of interest or the supposed "unfair advantage" Senior's representation of Gambrell gave Junior, it could have raised them long before trial. Instead, the State did nothing for more than two years, waiting until the eve of trial to file its disqualification motion.

¶ 32    Like the timing of the motion, its substance was dubious. With regard to exchange of confidential information, Senior testified, without contradiction, that he did not disclose any confidential information about Gambrell to Junior. The trial court evidently found this testimony credible, since it found that neither Senior nor Junior did anything unethical. See Ill. R. Prof'l Conduct (2010) R. 1.6(a) (eff. Jan. 1, 2010) (unethical for attorney to reveal information relating to the representation of a client). Thus, there was no concern that Junior had confidential information about Gambrell that he might use to cross-examine her or otherwise bolster the defense.

¶ 33    The State suggests that, at some unspecified time in the future, Junior might "inadvertently" have obtained confidential information about the People's case, but it presents no explanation as to how this would occur. Certainly the State's Attorney would not share confidences or trial strategy with a State witness, particularly one represented by a lawyer with connections to defense counsel. And from the record before us, we cannot discern what information Junior could have gained from Senior—inadvertently or otherwise—that would have allowed him an unfair advantage in cross-examining Gambrell. The evidence of Buckhanan's flight after the murder is undisputed. And if Gambrell had a criminal record that would call into question her credibility, that information would be equally available to both sides. Other than the unsupported suggestion that Senior would act unethically and share client

- 7 -

confidences with Junior,[2] the State does not articulate how Senior's representation of Gambrell posed any threat to its right to a fair trial. Such vague and unsupported speculation is insufficient to overcome the constitutional presumption in favor of a defendant's counsel of choice.

¶ 34 We note that *People v. Nevarez*, 2012 IL App (1st) 093414, cited by the State on this issue, is readily distinguishable. In *Nevarez*, Junior represented the defendant, while Senior represented two State witnesses and was present as they were interviewed by prosecutors and detectives. The *Nevarez* court found that Senior could not later appear as defendant's cocounsel. *Id.* ¶ 61. (Junior's representation of defendant was apparently not challenged, and he continued to represent the defendant through the trial.) Contrary to the State's contention, this is not at all analogous to the present case. A single attorney cannot represent both prosecution witnesses and the defendant in connection with the same case because it creates a legitimate concern that the attorney's knowledge of client confidences might give him an unfair advantage in cross-examining those witnesses. *Id.* ¶¶ 60-61. As discussed, there is no such concern in this case, where Senior has never disclosed client confidences to Junior and is not himself seeking to represent Buckhanan.

¶ 35 The State's remaining argument centers upon a purported contradiction between Gambrell's statement to police and her grand jury testimony. But, as noted, examination of these statements reveals no contradiction. According to the report of Gambrell's statement to police, on the morning after the murder, "Buckhanan informed Gambrelle [*sic*] that he had called the State Police and they informed him that he had to call Homicide Detectives." Meanwhile, in her grand jury testimony, Gambrell gave the following testimony about her meeting with Buckhanan:

> "Q. Did [Buckhanan] tell you whether or not *he had received a call* from the State Police?
>
> A. No, he didn't say. I don't remember him saying that.
>
> Q. Did he ever tell you whether or not Chicago Police Detectives were looking for him?
>
> A. I don't remember if he told me right then. I don't remember. I mean I knew later, but I don't remember if he told me at that point." (Emphasis added.)

Gambrell was not asked in her grand jury testimony whether Buckhanan told her that *he* had called the Illinois State Police. Conversely, in her statement to police, Gambrell did not say that Buckhanan told her that detectives were looking for him. Rather, the State hoped to infer from Buckhanan's statement that the Illinois State Police told him to call homicide detectives that Buckhanan must have known that the police were looking for him in connection with the murder. Thus, there is no inconsistency between these statements. Using these statements as a basis for claiming that Gambrell would "recant" her statement to police, thus necessitating that witnesses be called first to impeach and then to rehabilitate her, is without merit.

¶ 36 Moreover, even if Gambrell did happen to "recant," and the State decided to call a witness to impeach her, and Junior responded by calling Senior to rehabilitate her—a rather remote chain of events—the most the State argues this gives rise to is an appearance of impropriety.

---

[2]Of course, nothing prevented Gambrell from communicating any information she chose to Buckhanan and nothing prevented Buckhanan from revealing this information to his attorney.

And the appearance of impropriety alone is a slender reed on which to justify disqualification of counsel. As stated by the Supreme Court of Georgia: "The mere fact that the public may perceive some conduct as improper is, without some actual impropriety, insufficient justification for interference with a client's right to counsel of choice. This becomes even more apparent when the perceived impropriety is not conduct at all but is, instead, status." *Blumenfeld v. Borenstein*, 276 S.E.2d 607, 609 (Ga. 1981) (refusing to disqualify attorney merely because attorney's spouse had previously represented the opposing party; evidence showed that attorney's spouse had never revealed client confidences or otherwise acted unethically); see also *United States v. Washington*, 797 F.2d 1461, 1466 (9th Cir. 1986) ("We have grave doubts whether an appearance of impropriety would ever create a sufficiently serious threat to public confidence in the integrity of the judicial process to justify overriding Sixth Amendment rights."). As noted, the trial court explicitly found that neither Junior nor Senior committed any actual impropriety in their representation of their clients, so the mere appearance of impropriety should not be controlling.

¶ 37   More importantly, the potential for any appearance of impropriety could easily have been cured if the parties stipulated to Senior's testimony. See *Turner*, 594 F.3d at 952 (court should consider whether there are alternatives to disqualification that would remove the conflict while still protecting defendant's right to counsel). Specifically, the parties could have stipulated that if called to the stand, Gambrell's attorney would testify that he was present when Gambrell made her 2007 statement to police, and he did not recall her saying that Buckhanan told her he had been told to contact homicide detectives. By using a stipulation to avoid mention of Senior's name or his relationship to defense counsel, there would be no risk of any appearance of impropriety in the eyes of the jury.

¶ 38   The State emphasizes that the propriety of the disqualification must not be judged in hindsight because trial judges cannot be expected to anticipate all conflicts that may arise in the course of a trial. See *Wheat*, 486 U.S. at 162 (trial court "must pass on the issue of whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pretrial context when relationships between parties are seen through a glass, darkly"). But by the same token, a trial judge who is not privy to the evidence the State has amassed in support of its case is not in a position to second-guess prosecutors when they insist on the importance of certain evidence. And by September 2009, the State certainly knew the evidence it possessed.

¶ 39   At the disqualification hearing, the State told the judge that it intended to use Gambrell's testimony regarding her conversation with Buckhanan the day after the murder to show that Buckhanan knew he was wanted in a homicide investigation, thus explaining his abrupt departure. The experienced and respected trial judge was entitled to accept the State's assertion at face value. He found that the disputed statement was probative as to Buckhanan's state of mind and attempting to elicit that statement could possibly result in Junior having to cross-examine his father. What the trial court could not have known at that point was the abundant evidence of Buckhanan's flight in the State's possession wholly apart from Gambrell's testimony.

¶ 40   First and foremost, the State had Gambrell's testimony that, on the morning after the shooting, Buckhanan left their apartment without packing his bags or telling Gambrell where he was going and he never returned. Thus, the State was perfectly able to make its point about Buckhanan's abrupt abandonment of his girlfriend, his child and his home (and the

consciousness of guilt such conduct implied) without inquiring into the substance of his conversation with Gambrell. The State never suggested that Gambrell would recant this consistent aspect of both her statement to police and her grand jury testimony.

¶ 41    The State also had numerous other witnesses to testify on the subject of Buckhanan's flight. For instance, a vehicle service consultant for Infiniti of Lisle testified that Buckhanan brought in his car for repair and was issued a loaner car on the day before the shooting. A couple of hours after the shooting, a state trooper found the loaner car in a highway ditch with its keys in the ignition. Buckhanan never returned to Infiniti of Lisle to retrieve his car or pay his repair bill. Moreover, detectives testified that several months after the shooting, Buckhanan fled a vehicle stop, leading them on a several-block foot chase before he was apprehended.

¶ 42    Certainly had the trial court been aware of the relative insignificance of Gambrell's post-murder conversation with Buckhanan, its analysis of the relevant factors might well have resulted in denial of the State's disqualification motion. And, in fact, once the State's disqualification motion was granted and the case proceeded to trial with substitute counsel, the State made no attempt to elicit this evidence from Gambrell. In fact, the State did not ask Gambrell *anything* about the content of her conversation with Buckhanan on the morning after the murder. More than anything else, this leads us to question the State's good faith in depriving Buckhanan of his counsel of choice on the representation that the State planned to elicit this information at trial.

¶ 43    The State additionally argues that if Junior had continued representing Buckhanan, and he was convicted, Buckhanan could have appealed on grounds that his trial counsel was constitutionally ineffective for having labored under a conflict of interest. But Buckhanan waived any conflict in open court after indicating that he read Junior's response to the State's disqualification motion. See *People v. Robinson*, 79 Ill. 2d 147, 166 (1979) (upholding conviction where defendant argued that his counsel had a conflict of interest, but defendant made a knowing and intelligent waiver of any conflict). We note that the State does not argue that Buckhanan's waiver was uninformed or otherwise ineffective. Additionally, to use the words of the *Robinson* court, Buckhanan's decision to waive any conflict "does not appear imprudent" (*id.*) given the tenuous nature of the potential conflict and Junior's long professional relationship with Buckhanan.

¶ 44    Finally, the State argues that Buckhanan could have taken an interlocutory appeal of the disqualification order, rather than proceeding to trial with substitute counsel and then raising the issue following his conviction. See Ill. S. Ct. R. 604(g) (eff. July 1, 2006) (a criminal defendant "*may* petition for leave to appeal" the circuit court's disqualification of his attorney based on a conflict of interest (emphasis added)). The State implies that Buckhanan's failure to pursue an interlocutory appeal might have been a strategic ploy to obtain "two bites of the apple." We find such speculation to be both unsupported and implausible. When Buckhanan's counsel was disqualified on November 16, 2009, Buckhanan had been in custody for nearly two years. He could logically have decided that it best served his interests to proceed to trial, instead of filing an appeal that would delay his trial date—and extend his jail stay—for at least another year. But in any event, the plain language of Rule 604(g) provides that interlocutory appeals of disqualification orders are permissive rather than mandatory, and the State does not cite any authority to the contrary.

## CONCLUSION

We hold that the trial court's disqualification order violated Buckhanan's sixth amendment right to choose his own counsel. Under *Gonzalez-Lopez*, 548 U.S. at 148-51, this constitutional violation is a structural error not subject to harmless-error review. We therefore reverse Buckhanan's conviction and remand for retrial. Because we are reversing his conviction, we need not consider Buckhanan's contentions that he was prejudiced by the performance of substitute counsel.

Reversed and remanded.