**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 190610-U

Order filed April 11, 2023

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0610 Circuit No. 13-CF-568 |
| | ) | |
| RICHARD MOSER, | ) ) | Honorable Kathy S. Bradshaw-Elliott, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices McDade and Davenport concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The evidence was sufficient to prove the defendant guilty of each of the predatory criminal sexual assault of a child charges, (2) the circuit court did not abuse its discretion in disqualifying the defendant's counsel of choice, and (3) the State did not commit prosecutorial misconduct.

¶ 2    The defendant, Richard Moser, appeals from his five convictions for predatory criminal sexual assault of a child. The defendant contends that (1) the State presented insufficient evidence to support his guilty verdicts; (2) the Kankakee County circuit court abused its discretion when disqualifying the defendant's counsel of choice; and (3) the State committed

prosecutorial misconduct in its closing argument when it (a) argued facts not in evidence, (b) accused defense counsel of inducing perjury, and (c) improperly vouched for the credibility of its witnesses.

¶ 3                                                   I. BACKGROUND

¶ 4         On December 20, 2013, the grand jury indicted the defendant on five counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)). Counts I, II, and III alleged that the defendant committed acts of sexual penetration with A.M., in that the defendant placed his penis in A.M.'s mouth and anus, and placed A.M.'s penis in the defendant's mouth. Counts IV and V alleged that the defendant committed acts of sexual penetration with K.S., in that the defendant placed his penis in K.S.'s mouth and anus. On December 1, 2014, John Ridge filed his appearance on behalf of the defendant.

¶ 5         On June 19, 2017, the State filed a motion to disqualify Ridge. Specifically, the State alleged that Ridge contemporaneously represented a State's witness, William Moser, on a traffic charge during the pendency of the present case. William pled guilty to that charge on April 12, 2017. The State indicated that William was the defendant's brother and the father of A.M. Ridge's representation caused a conflict of interest and created doubts that the defendant would be afforded loyal counsel.

¶ 6         The State also noted that William had failed to appear per his subpoena and bring A.M. to court that morning. When court reconvened that afternoon, William was present without A.M. Ridge attempted to explain why William was late. The court indicated that it would first deal with the State's disqualification motion and reminded Ridge that he did not represent William.

¶ 7         The State asserted that the conflict caused by a contemporaneous representation of a State's witness would remain throughout the case, even if the representation ended pretrial. The

2

State contended that present circumstances amounted to a *per se* conflict that warranted Ridge's disqualification. Ridge argued that William was not an adverse witness, and that the defendant's waiver would resolve the issue. Both the defendant and William completed affidavits indicating that they consented to Ridge's representation.

¶ 8   Following arguments, the court confirmed that William was a State's witness. The court found that Ridge's representation created a conflict of interest. The court noted Ridge's recent attempts to advocate for William when he failed to appear on his subpoena. The court indicated that it sought to "avoid even the appearance of inappropriate [*sic*] and extol the notions of fairness" and that the present conflict would "tarnish that image." The court continued the jury trial and William's subpoena to the next court date, ordering William to bring A.M. Ridge filed a motion to reconsider. Following a hearing, the court denied the motion. In its ruling, the court stated that it had previously found that Ridge's representation was a *per se* conflict of interest. On November 2, 2017, David Sotomayor filed his appearance on behalf of the defendant.

¶ 9   On June 17, 2019, the case proceeded to a jury trial. Kristina H. testified that she was the mother of K.S. and A.M. Kristina and William were in a relationship that ended in 2015 and they shared custody of their son, A.M. At the time of trial, K.S. was living with Kristina and A.M. lived with William's family. On November 5, 2013, Kristina and William moved to Kankakee. During the move, the defendant watched K.S. and A.M. at the new residence. At the time, A.M. and K.S. were five and six years old, respectively.

¶ 10   On December 6, 2013, while William, Kristina, A.M., and K.S. were watching a movie, A.M. said that the defendant "made [A.M.] suck his dick." K.S. responded, "shh, you're not supposed to tell them. It's a secret." When Kristina asked K.S., he confirmed that the allegations were true. The defendant made K.S. lay on his stomach on the floor. The defendant laid on top of

3

K.S., held him down, and tried to penetrate him. On another occasion, the defendant "had them give him oral" and performed oral sex on A.M. and K.S. A.M. reported to police that the alleged assault occurred in their current residence. Both A.M. and K.S. said the abuse occurred in their bedroom. Kristina took both children to the hospital for examinations and the Children's Advocacy Center (CAC) for forensic interviews. Following their disclosures, Kristina observed inappropriate sexual touching between the children.

¶ 11    On cross-examination, Kristina stated that both A.M. and K.S. used the terminology "dick" and "lick my pee-pee," would try to "grab each other's penis," and pulled each other's pants down for fun before the allegations in November 2013. Soon after the initial disclosure, A.M. told Kristina that the defendant did not try to put his penis in A.M.'s anus. Several months prior to trial, A.M. told Kristina that the defendant's mother, Danielle Moser, and William told A.M. to say that the allegations were not true. Kristina told A.M. to tell the truth and that he could get into trouble for lying.

¶ 12    A.M. testified that he was 10 years old at the time of trial. A.M. stated that William and Danielle did not tell him to lie or what to say and that he was nervous and scared to testify. A.M. remembered when he lived with Kristina, William, and K.S. but did not recall moving to Kankakee, watching a movie with his parents, or disclosing sexual abuse by the defendant. A.M. stated that no one had touched him inappropriately, and he had never reported inappropriate touching. After meeting with the State the day before testifying, A.M. went to lunch with Sotomayor, his stepmother, and Danielle. At lunch, Sotomayor talked with A.M. about the difference between a truth and a lie. A.M. recalled speaking with the CAC interviewer about the defendant but did not recall what he had told her. A.M. did not remember going to the hospital.

¶ 13    On cross-examination, A.M. stated that he told Sotomayor that he watched his recorded interview with the State. The State told A.M. that he had to testify about what he said in the interview. A.M. was concerned that Kristina would be mad because she wanted A.M. to testify a certain way. On redirect examination, A.M. stated that he was worried he would be removed from his home.

¶ 14    K.S. testified that he was 11 years old at the time of the trial. K.S. moved to Kankakee in 2013 and lived with Kristina, William, and A.M. During the move, the defendant watched K.S. and A.M. at the new residence. At some point, the defendant, A.M., and K.S. were in their bedroom. Both the defendant and K.S. were on their knees, and K.S. had his back bent. The defendant pulled K.S.'s pants down and "put his private area in [K.S.'s] behind." William entered the bedroom and asked what was going on, and the defendant said "[n]othing." K.S. stated that there were four to five other similar instances of sexual misconduct. K.S. indicated two incidents occurred at the defendant's house prior to the present offense. One incident occurred in the bathroom of the defendant's residence, where the defendant made K.S. "suck his private." Another occurred in the defendant's bedroom. After these events, while watching a movie, A.M. disclosed to Kristina and William that he saw K.S. "suck [the defendant's] private part." K.S. told Kristina that it was true and explained what had happened. After speaking to the police, K.S. went to the hospital and gave a recorded statement at the CAC. K.S. did not remember seeing the defendant assault A.M.

¶ 15    On cross-examination, K.S. said that he told A.M. to "[s]hh" when A.M. disclosed the abuse because he was afraid that he would get "in trouble" and "didn't know what would happen" to him. K.S. denied saying "[l]ick my pee-pee" prior to the incidents and pulling down William and the defendant's pants for fun. K.S. admitted that he cried during his current

5

testimony. Sotomayor asked, "[t]hat's because you are distraught, right?" When K.S. agreed, Sotomayor asked, "What does the word, Distraught, mean?" K.S. stated, "[n]ever mind. I don't know. Sorry." K.S. recalled crying during parts of his recorded interview when asked serious questions. K.S. admitted that he told the CAC interviewer that the incident in his bedroom occurred while K.S. was on the floor. K.S. clarified that the abuse occurred on the mattress laying on the floor. K.S. said that the incident in the bathroom at the defendant's residence lasted approximately 10 minutes. K.S. did not initially report the abuse because "it was embarrassing." K.S. explained that when William entered the bedroom on moving day, the defendant had finished sexually assaulting but K.S. still had his pants down. K.S. described the first incident of abuse occurring in November 2013, and that there were five assaults total but could not remember the specific dates. K.S. said the first incident occurred on November 25, 2013, but later stated, "I don't know. I forgot," and "it was in November. I just picked a day. It's not the right day." K.S. acknowledged that he could only describe three incidents.

¶ 16    William testified that he was in custody at the time of trial. William lived with Kristina in Kankakee but was not sure if it was in 2013. When they moved, he and Kristina transported their items while the defendant watched the children at the new residence. William did not recall watching a movie with Kristina, A.M., and K.S. when A.M. disclosed the assaults or when the police came to his house in December 2013. William did not recall A.M. telling him that the defendant "put this much of his dick" in A.M.'s mouth and demonstrated the amount with his fingers. William remembered that the Department of Children and Family Services (DCFS) was called when A.M. and K.S. reported the defendant's inappropriate touching. William did not remember talking to DCFS about the allegations.

¶ 17 William recalled his interview with police on December 11, 2013. William told the officer that A.M. said that the defendant had A.M. "suck his dick." William remembered saying that on moving day, he walked past A.M. and K.S.'s bedroom and saw K.S. on his stomach pulling up his pants and the defendant stood and pulled up his pants. William explained that Kristina threatened to take his children away if he did not "go along" with what Kristina said.

¶ 18 Regarding his interview with the police and his testimony at a pretrial hearing in this case, William did not remember watching a movie with Kristina, A.M., and K.S. when A.M. said that defendant made him "suck [the defendant's] pee-pee or dick" and K.S. said "[s]hut up. That's a secret." William did not remember telling the officer that K.S. demonstrated what had happened by getting on the floor, that K.S. said the defendant "stuck this much" in his anus, or that the defendant had A.M. and K.S. "sucking his dick." William did not remember saying that K.S. said that A.M. "put the tip of [the defendant's] penis in his mouth, and he spit it out and said it was nasty." William did not recall demonstrating the gesture that A.M. made to describe what happened by cupping his hand and moving it back and forth. William denied testifying previously that during the move he saw the defendant with K.S. and A.M. in their bedroom and K.S. was on the floor pulling up his pants and the defendant pulled up his pants.

¶ 19 On cross-examination, William stated that Kristina had the defendant arrested several times. K.S. informed William that Kristina told him to lie about the assaults. A.M. told William that he was "tired of lying for his mother. [The defendant] didn't do nothing." When William saw A.M. and K.S. pulling down each other's pants for fun in the house, he would also hear them say "[l]ick my pee-pee" and "[s]uck my dick" prior to the alleged abuse.

¶ 20 Deanna Booker testified that she was a nurse and examined K.S. and A.M. on December 6, 2013. K.S. told Booker that the defendant kissed K.S. and asked him to "suck his pee-pee."

7

The defendant also told K.S. that he would be in trouble if he told someone. A.M. did not answer Booker's questions. Booker did not collect evidence from K.S. or A.M. due to the assaults occurring more than 30 days prior. On cross-examination, Booker stated that she did not observe any physical manifestations of trauma on K.S. or A.M. On redirect examination, Booker stated it was possible not to observe signs of injury 30 days after the assault.

¶ 21    Detective Jennifer Schoon interviewed the defendant regarding the allegations of abuse. The defendant was 17 years old at the time of the incidents.

¶ 22    Andrea Fox testified that on December 11, 2013, she performed the CAC interviews with K.S. and A.M. The State entered the interviews into evidence and published them to the jury. At times during A.M.'s interview, he was difficult to understand. A.M. identified the "pee-pee" and "butt" on the anatomical drawing. When Fox asked if anyone talked to A.M. about the interview, A.M. stated, "[the defendant]." Fox asked where no one should touch A.M., he said his "face" and then "[the defendant]." A.M. pointed to the anatomical drawing to show that the defendant's lips touched A.M.'s lips. A.M. did not like when the defendant kissed him. Fox asked if the defendant did something bad to someone, A.M. pointed to the penis on the anatomical drawing. A.M. then said the defendant put his "pee-pee" in K.S.'s "butt." Fox asked how A.M. knew that happened, A.M. responded that "he really did it" and that it occurred in A.M. and K.S.'s bedroom when they were moving. A.M. also stated that K.S. put his mouth on the defendant's "pee-pee." A.M. stated that the defendant told A.M. to "suck his dick." Fox asked if anyone had touched A.M.'s "pee-pee." A.M. said "[the defendant] did." The defendant "sucked" A.M.'s penis. A.M. put his mouth on the defendant's penis and told the defendant "ew" and "no" and stated that the defendant's penis "smelled like poop." The defendant removed A.M.'s pants and put his "pee-pee" in A.M.'s "butt." The defendant had his pants on, but his penis was exposed.

8

When asked what the defendant did when he put his penis in A.M.'s anus, A.M. stated that the defendant "put his butt in my butt and then he licked his pee-pee." When asked how the defendant "licked his pee-pee," A.M. stated, "in my butt." A.M. reported that the defendant put his "pee-pee" in A.M.'s "butt" five times.

¶ 23    In his interview, K.S. identified a "pee-pee" on an anatomical drawing. K.S. stated that the defendant gave him unwanted kisses. When they were moving, the defendant watched K.S. and A.M., and wanted K.S. to kiss his lips. The defendant had touched K.S. in other ways, but K.S. said he was "too shy" to tell Fox. K.S. then said that the defendant "put his private in my butt." The defendant pulled K.S.'s pants down and his penis touched "the skin" of K.S.'s anus. William entered the room and asked what was going on, and the defendant said "nothing." K.S. denied that the defendant put his penis in K.S.'s mouth. K.S. stated that there were five incidents of abuse. The first incident was at the defendant's residence. K.S. described the second incident in the defendant's bedroom where the defendant was on top of K.S.'s back while K.S. laid on his stomach and the defendant put his "pee-pee in [K.S.'s] butt" and "hump[ed]" him. K.S. stated that the defendant put "spit on his fingers" and "rub[bed] it on his private" before putting his penis in K.S.'s anus. K.S. did not tell Kristina because he thought he was going to "get in trouble." The defendant told K.S. that A.M. "suck[ed the defendant's] private." K.S. remembered that A.M. disclosed the defendant's abuse to Kristina and William. On cross-examination, Fox testified that K.S. did not state in the interview that the defendant placed his penis in K.S.'s mouth. K.S. did not cry during the interview.

¶ 24    The State noted in its closing argument the definition of sexual penetration as "any contact, however slight, between the sex organ or anus of one person, and the sex organ or mouth of another person." The State suggested that K.S.'s confusion with the dates that the abuse

9

occurred was due to Sotomayor's intimidating manner of questioning. Sotomayor did not object to the State's comments. The State addressed the lack of injury observed and argued that "you can use your common sense. How long did your last bruise last? How long did your last cut last? How long did your last injury last? Any trauma or injury that lasts over 30 days?" Sotomayor did not object to the State's arguments.

¶ 25　　　　Sotomayor argued that the State presented insufficient evidence to convict the defendant. Specifically, K.S. and A.M. had been using words like "[s]uck my dick" and "[l]ick my pee-pee" prior to the present allegations. Further, A.M. and K.S.'s accounts were too inconsistent to be true. Sotomayor argued that K.S.'s testimony resulted from "[a]dult manipulation" by Kristina. Sotomayor suggested that the State coached K.S. to give certain testimony consistent with his prior statements. Regarding the lack of injury from the alleged abuse, Sotomayor stated,

> "Now, you can use your common life experiences that the muscles in the rectum are geared so they push out. They're not geared for a[n] erect male penis to be inserted into that rectum and being pumped for ten minutes.
>
> *** You would have tearing. You would have hemorrhoids. You would have something that showed that that rectum was violated."

Sotomayor stated that he did not take A.M. to lunch prior to trial. Rather, A.M. wanted to meet with Sotomayor to talk about the case, which is within Sotomayor's right to do. Further, the evidence showed that Sotomayor did not manipulate A.M. Instead, A.M. was "put up to lie" by Kristina. Sotomayor continued, "Kristina *** tells you that [A.M.] said that [the defendant] never put his dick, wee-wee, in the anus of [A.M.] before the interview. Recall that testimony."

¶ 26　　　　In rebuttal, the State addressed Sotomayor's argument regarding the lack of physical evidence of the abuse and stated, "The rectum is—it's an orifice; things go out, and sometimes

things go in. *** We know that anal sex occurs. You're not going to have a gaping anal hole for everybody to see." Sotomayor did not object to these comments. The State addressed the motivation to lie and alleged "[a]dult manipulation" of K.S. Sotomayor did not object. The State continued, "When you saw K.S. testify, were those crocodile tears to you, or was he a young boy still embarrassed and still upset about what happened to him, having to tell a courtroom full of strangers, and then being badgered by the defense?" Sotomayor objected to the characterization of "badgered." The court overruled the objection. The State continued, "He was in [K.S.'s] face. That's intimidating for anybody, especially this boy, and he came in here and was able to tell you." Sotomayor did not object. The State argued,

> "[I]f [defendant is] wetting his penis by spitting on it, and then just putting this much into their anus or into their mouth, you know, you're not going to have tearing, you're not going to have a big gaping hole. Or you're not going to have— you don't get hemorrhoids, okay, from oral sex, and you don't get hemorrhoids from anal sex either."

Sotomayor objected due to lack of evidence. The court overruled the objection noting that Sotomayor argued that there would be hemorrhoids.

¶ 27        The State responded to Sotomayor's allegation that Kristina attempted to coerce A.M. to testify against defendant, by stating:

> "[W]e very well know who wears the pants in the Moser family. That's Danielle
> ***. That's the defendant's mother.
>
> * * *
>
> Do you really believe that [A.M.] there with his dad's girlfriend, knowing his dad's in jail, with [Danielle], knowing that they just came from the courthouse

11

about something about [the defendant], they're sitting at [lunch], and that it's a nice, friendly conversation about, Oh, do you know the difference between the truth and a lie?"

Sotomayor did not object. The State continued, "Isn't it more reasonable to assume that they're telling him, Do you know that a lie is what you've been telling all this time about [the defendant]?" Sotomayor objected and the court overruled the objection. The State continued,

"The truth, [A.M.], is that he didn't do that, right? That's the truth, and, by the way, if you don't tell the truth, you're not staying here.

Because you heard [A.M.] *** [Y]ou know, what he was concerned about, what he was worried about when he was sitting here testifying, is that he was going to be taken away.

Why would he be concerned that he's going to be taken away? Somebody had to tell him that. [A.M.], if you don't testify the way that we want you to testify."

Sotomayor objected, and the court overruled his objection. The State continued, "If you don't testify that way, if you don't testify to telling the truth about that, you're not going to have a place to stay. Your dad's in jail. Where are you going to go? That's the puppet master."

Sotomayor did not object. The State continued, "What I submit to you is disgusting is that [A.M.] has been told not to say this. That's disgusting; that a child who has had something happen to him cannot freely say that this person has done it to him; that he has been threatened."

Sotomayor objected due to lack of evidence. The court overruled his objection. The State continued, "[h]e is being told not to say what really happened. He does not get his day in court because [Danielle's] telling him not to say anything. [William is] telling him not to say

12

anything." Again, Sotomayor objected, and the court overruled the objection. The State continued, "You heard Kristina tell you in court that [K.S.] has told her that [William] and [Danielle] are telling him to lie. *** [T]hey want to manipulate you to think that this was all a big conspiracy. This defendant is the unluckiest person here in this room." Sotomayor did not object to the State's final comments.

¶ 28      The court instructed the jury that "[i]t is your duty to determine the facts and determine them only from the evidence in this case." The court continued that only the jurors "are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them" and "[n]either opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

¶ 29      Following deliberations, the jury found the defendant guilty on all five counts of predatory criminal sexual assault of a child. Sotomayor filed a combined motion for a new trial and motion notwithstanding the verdict. In the motion, Sotomayor argued, *inter alia*, that (1) the State failed to present sufficient evidence to sustain the defendant's convictions, (2) the court erred by dismissing Ridge, and (3) the court erred by overruling his objections to the State's improper closing arguments regarding "personal beliefs comments, comments attacking the ethics of defense counsel by his interaction with A.M. prior to his testimony." During the hearing on the motion, Sotomayor specifically referenced the State's comments regarding his "reported manipulation" of A.M. and there being a lack of evidence for the State's comments regarding penetration and injury. The court denied the motion. The court sentenced the defendant to 35 years' imprisonment. The defendant appeals.

¶ 30                                II. ANALYSIS

13

¶ 31    The defendant argues that (1) the State presented insufficient evidence to support his convictions, (2) the court abused its discretion when disqualifying the defendant's counsel of choice, and (3) the State committed prosecutorial misconduct in its closing argument when it (a) argued facts not in evidence; (b) accused defense counsel of inducing perjury; and (c) improperly vouched for the credibility of its witnesses.

¶ 32                              A. Sufficiency of the Evidence

¶ 33    The defendant argues that his convictions should be reversed where the allegations of abuse were "vague, contradictory, internally inconsistent, and impeached by prior statements."

¶ 34    In a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "[I]it is not the function of this court to retry the defendant." *Id.* We "must allow all reasonable inferences from the record in favor of the prosecution." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Witness credibility and the weight given to testimony are determinations left to the trier of fact. *People v. Nitz*, 143 Ill. 2d 82, 95 (1991). "A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 35    The defendant was charged with five counts of predatory criminal sexual assault of a child. 720 ILCS 5/11-1.40(a)(1) (West 2012). As charged in this case, "[a] person commits predatory criminal sexual assault of a child if that person commits an act of sexual penetration, is 17 years of age or older, and: (1) the victim is under 13 years of age." *Id.* "Sexual penetration" is defined as "contact, however slight, between the sex organ or anus of one person and the sex

14

organ or mouth of another person." Illinois Pattern Jury Instructions, Criminal, No. 11.65E (4th ed. 2000).

¶ 36    Initially, we note that the parties do not dispute that at the time of the allegations the ages of A.M. and K.S. were five and six years old, respectively, and defendant was 17 years old. Accordingly, we proceed to review the remaining elements of the charged offenses.

¶ 37    First, the State proved the sexual penetration element of count I. A.M. disclosed to K.S. and Kristina that the defendant made A.M. "suck his dick." A few days later, A.M. stated in his CAC interview that the defendant told A.M. to "suck his dick." Despite A.M.'s young age and some difficulty in communicating the allegations, A.M. identified a penis and anus in the anatomical drawing and described the defendant placing his penis in A.M.'s mouth and anus and A.M. placing his mouth on the defendant's penis. When A.M. put his mouth on the defendant's penis, A.M. said "ew" and told the defendant "no" and stated that the defendant's penis "smelled like poop." Further, K.S. reported that the defendant told him that A.M. "sucked [the defendant's] private." Not only did A.M. disclose the defendant's abuse to Fox, but he reported the abuse to Kristina and William.

¶ 38    Second, the State proved the sexual penetration element of count II. According to A.M. in his CAC interview, the defendant removed A.M.'s pants and put his "pee-pee" in A.M.'s "butt." A.M. reported that the defendant put his "pee-pee" in his "butt" five times.

¶ 39    Third, the State proved the sexual penetration element of count III. When asked about the allegations generally in his CAC interview, A.M. said the defendant "sucked" A.M.'s "pee-pee." Fox asked if anyone had touched A.M.'s "pee-pee," and A.M. stated, "[the defendant] did."

¶ 40    Fourth, the State proved the sexual penetration element of count IV. In his CAC interview, K.S. identified a penis on the anatomical drawing. K.S. testified that in the bathroom

15

of the defendant's residence, the defendant made K.S. "suck his private." A.M. corroborated K.S.'s allegations by stating that K.S. put his mouth on the defendant's "pee-pee."

¶ 41        Finally, the State proved the sexual penetration element of count V. On moving day, K.S. stated that the defendant watched K.S. and A.M., and the defendant wanted K.S. to kiss his lips. The defendant pulled K.S.'s pants down and "put his private in [K.S.'s] butt" and touched his "skin." K.S. recalled William entering the room and asking what was going on. K.S. stated that there were five incidents of abuse. K.S. was consistent in his allegation about the location and time of the incident in the bedroom, and K.S.'s account is corroborated by the plausibility of the assault location and time. William saw K.S. and the defendant in the bedroom pulling up their pants on moving day. Further, A.M. stated in his CAC interview that the defendant put his "pee-pee" in K.S.'s "butt" in their bedroom when they were moving.

¶ 42        K.S. described a separate incident in the defendant's bedroom where the defendant told K.S. to lie down, and the defendant got on top of K.S. While K.S. was laying on his stomach, the defendant put his "pee-pee in [K.S.'s] butt" and "hump[ed]" K.S. The defendant put "spit on his fingers" and "rub[bed] it on his private" before putting his penis in K.S.'s anus. The similarity of the defendant's actions lends to the credibility of K.S.'s description of the other incidents.

¶ 43        We note that while the evidence for counts II and III was not as strong as counts I, IV, and V, A.M.'s allegations were consistent with the pattern of abuse that K.S. described. Further, while A.M.'s claims in his CAC interview were uncorroborated, "[t]he testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant." *People v. Gray*, 2017 IL 120958, ¶ 36. We do not find that the inconsistencies between A.M.'s initial statements and his trial testimony compel the conclusion that no reasonable person could have accepted the evidence beyond a reasonable doubt. See *id.*

16

Additionally, witness credibility and the weight given to testimony are determinations left to the trier of fact. See *Nitz*, 143 Ill. 2d at 95. Here, from our review of the record, the jury reasonably determined that A.M. and K.S.'s allegations were credible. Accordingly, viewed in the light most favorable to the State, the evidence proved beyond a reasonable doubt that the defendant committed five counts of predatory criminal sexual assault of a child.

¶ 44                                    B. Disqualification of Counsel

¶ 45          The defendant argues that his convictions should be reversed where the circuit court violated his sixth amendment right to counsel of his choice by discharging Ridge.

¶ 46          The sixth amendment of the United States Constitution guarantees criminal defendants the right to effective assistance of counsel, which encompasses a right to be represented by counsel of choice. U.S. Const., amend. VI; *Wheat v. United States*, 486 U.S. 153, 157 (1988). The right to counsel of choice is not absolute and is limited in several respects, including the disqualification of chosen counsel in the event of a conflict of interest. *People v. Jackson*, 2013 IL App (3d) 110685, ¶ 17.

> "[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159.

However, "a trial court may exercise its discretion to deny a defendant's right to counsel of choice only if it could reasonably find that defense counsel has a specific professional obligation that actually does conflict or has a serious potential to conflict with defendant's interests." *People v. Ortega*, 209 Ill. 2d 354, 361 (2004). The circuit court is in the best position to weigh

17

and evaluate the facts and circumstances and the particular interests in each case to determine whether disqualification is warranted. *People v. Holmes*, 141 Ill. 2d 204, 223 (1990). Further, "[t]he trial court retains 'substantial latitude' to refuse a defendant's waiver of her trial counsel's actual or potential conflict of interest." *Jackson*, 2013 IL App (3d) 110685, ¶ 18 (quoting *Wheat*, 486 U.S. at 163).

> "[A circuit court] must recognize a presumption in favor of [the defendant's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court."
> *Wheat*, 486 U.S. at 164.

"[A] valid waiver by itself does not negate the trial court's authority to deny counsel of choice." *Ortega*, 209 Ill. 2d at 364. A circuit court's decision to disqualify counsel must be affirmed unless there is a clear abuse of discretion. *Holmes*, 141 Ill. 2d at 224. The circuit court abuses its discretion "if it fails to apply the proper criteria when it weighs the facts, and our inquiry must consider both the legal adequacy of the way the trial court reached its result as well as whether the result is within the bounds of reason." *Ortega*, 209 Ill. 2d at 360.

¶ 47     There are two steps used to determine whether a circuit court abused its discretion by disqualifying the defendant's chosen counsel. *People v. Buckhanan*, 2017 IL App (1st) 131097, ¶ 27. First, the court must determine whether there is an actual or serious potential for conflict. *Ortega*, 209 Ill. 2d at 361. If so, the second step is to determine whether the interests threatened by the conflict or potential conflict overcomes the presumption favoring the defendant's chosen counsel. *Id.* In reaching a decision, a circuit court may consider: (1) the likelihood that defense

18

counsel will have divided loyalties, (2) the State's right to a fair trial in which defense counsel acts ethically and does not use confidential information to attack a State's witness, (3) "the appearance of impropriety should the jury learn of the conflict," and (4) the likelihood that defense counsel's continued representation "will provide grounds for overturning [the] conviction." *Id.* at 361-62. "A trial court may weigh any of these factors, as the case requires." *Id.* at 362. A valid waiver does not negate the circuit court's authority to deny counsel of choice. *Id.* at 364. The second and third factors cannot be waived by a defendant. *Id.* at 369.

¶ 48    Here, Ridge began representing the defendant on December 1, 2014. During the pendency of the defendant's case, in 2017, Ridge represented William in an unrelated traffic case. It is clear that Ridge's representation of the defendant was contemporaneous with his representation of William, a State's witness, the defendant's brother, and A.M.'s father. Ridge's continued representation of the defendant placed him in the position of cross-examining William, his former client, which could hinder or give the defendant an unfair advantage by any confidential information acquired through Ridge's representation of William. See *Jackson*, 2013 IL App (3d) 110685, ¶ 21.

¶ 49    The record supports the court's findings that, given Ridge's former representation of William, Ridge's representation of the defendant presented a serious potential conflict of interest that could negatively affect the State and defense. We note that *Ortega* does not require the court to consider all four factors exclusively. Instead, *Ortega* outlines "permissible considerations," to be contemplated as the case requires. *Ortega*, 209 Ill. 2d at 364. Although the court did not expressly reference the *Ortega* factors, it considered the State's right to a fair trial and the appearance of impropriety, two factors that the defendant cannot waive. See *id.* at 369. Further, given the potential for conflict and the appearance of impropriety, the decision was "within the

19

bounds of reason." *Id.* at 360. Therefore, the court did not abuse its discretion when it disqualified Ridge despite the defendant's waiver of any potential conflict of interest.

¶ 50                                C. Prosecutorial Misconduct

¶ 51     The defendant contends the following acts of prosecutorial misconduct in the State's closing argument deprived him of a fair trial, in that the State: (a) argued facts not in evidence; (b) accused defense counsel of inducing perjury; and (c) improperly vouched for the credibility of its witnesses. At the outset we note that the defendant forfeited his claim that the State improperly vouched for the credibility of its witnesses and only preserved some of his challenges to the State's comments related to the defendant's two other claims. See *People v. Enoch*, 122 Ill. 2d 176, 186-87 (1988) (a defendant must both contemporaneously object at trial and include the specific alleged error in a written posttrial motion to preserve an issue for appeal). Accordingly, we begin by reviewing arguments that were preserved for appellate review.

¶ 52     "Generally, improper closing arguments by the State will constitute reversible error only if there is doubt as to whether the jury would have rendered a guilty verdict in the absence of the comments." *People v. Libberton*, 346 Ill. App. 3d 912, 924 (2003). "Closing arguments must be viewed in their entirety and the allegedly erroneous argument must be viewed contextually." *People v. Blue*, 189 Ill. 2d 99, 128 (2000).

¶ 53     The circuit court has discretion to regulate the substance and style of the closing argument, and the court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion. *Id.* A reviewing court will find reversible error "only if the defendant demonstrates that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error." *People v. Runge*, 234 Ill. 2d 68, 142 (2009).

20

Whether the State's comments in closing argument are so egregious as to warrant a new trial is reviewed *de novo*. *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007).

¶ 54                                    1. Arguing Facts Not in Evidence

¶ 55        The defendant argues that the State introduced facts not previously entered into evidence when it argued in rebuttal that defendant's actions of "wetting his penis by spitting on it, and then just putting this much into their anus or into their mouth" would not cause physical trauma such as tearing or hemorrhoids.

¶ 56        Here, the State's comments were made in response to Sotomayor's argument that "the muscles in the rectum are geared so they push out. They're not geared for a[n] erect male penis to be inserted into that rectum and being pumped for ten minutes." Sotomayor's argument went beyond the State's original argument regarding the definition of sexual penetration—that it was possible that K.S. and A.M. would not show any signs of sexual penetration given that their disclosure occurred more than 30 days after the incident. Therefore, viewing the State's argument in context, we find the statements were not improper. See, *e.g.*, *People v. Glasper*, 234 Ill. 2d 173, 208 (2009) (finding the State's closing argument comment was not error because they were invited by defense counsel's comments).

¶ 57                            2. Accusing Defense Counsel of Inducing Perjury

¶ 58        The defendant argues that the State improperly suggested that Sotomayor induced A.M. to perjure himself, in coordination with William and Danielle, and argued that "they[ ]" pressured A.M. to change his testimony by threatening he would no longer be able to live with Danielle and when it stated that Sotomayor "badgered" K.S.

¶ 59        The sixth amendment of the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against

21

him." U.S. Const., amend. VI. The Supreme Court described this requirement as "confrontation plus cross-examination of witnesses." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). "Negative comments about a defendant's exercise of his or her constitutional rights are improper because they penalize the defendant for the exercise of those rights." *Libberton*, 346 Ill. App. 3d at 923. Generally, a closing argument that suggests that the defense suborned perjury is improper. *People v. Emerson*, 97 Ill. 2d 487, 497 (1983).

¶ 60        In the present case, Sotomayor argued that he did not coordinate a meeting with A.M. prior to trial. Further, he had a legal right to meet with A.M. and in no way did he personally manipulate A.M. Sotomayor suggested that Kristina was responsible for manipulating A.M., as evidenced by her statement that "[A.M.] said that [the defendant] never put his dick, wee-wee, in the anus of [A.M.] before the interview."

¶ 61        Viewed in context, the State did not accuse defense counsel of inducing or eliciting perjured testimony. Instead, in response to Sotomayor's argument, the State asserted that A.M. received pressure from other family members. Specifically, the State argued that Danielle and William altered A.M.'s testimony by pressuring or threatening him that he may be removed from their home. Moreover, the State did not criticize the defendant's right to cross-examine witnesses but commented on the manner that Sotomayor used to cross-examine K.S. *Cf. Libberton*, 346 Ill. App. 3d at 923 (finding error where the State's argument suggested that a decent person in the defendant's position would have waived his right to a trial and pled guilty). Therefore, the State's comments regarding who was responsible for manipulating A.M. were not error. Even assuming that the State's comments were error, the defendant did not demonstrate that "the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error." *Runge*, 234 Ill. 2d at 142.

¶ 62                                3. Forfeited Arguments

¶ 63          The defendant failed to preserve the following issues for appellate review, that the State

(1) argued facts not in evidence, specifically, when the State asked the jury to use their common

sense regarding the anatomy of a rectum and lack of injuries that result from various activities,

and (2) accused defense counsel of inducing perjury. *Supra* ¶¶ 28, 30-31; see *Enoch*, 122 Ill. 2d

at 186-87. Additionally, the defendant failed to object at trial and include in his posttrial motion

the claim that the State improperly vouched for the credibility of its witnesses. *Supra* ¶ 31;

*Enoch*, 122 Ill. 2d at 186-87.

¶ 64          When the defendant forfeits appellate review of a claim of error, we may only consider

the claim when the defendant establishes that a plain error occurred. See Ill. S. Ct. R. 615(a). In

his appellant brief, the defendant made no request for plain error review. As no plain error

argument was made, even if the State erred in closing argument, the defendant "cannot meet his

burden of persuasion." See *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). Therefore, we must

honor his procedural default.

¶ 65                                    III. CONCLUSION

¶ 66          The judgment of the circuit court of Kankakee County is affirmed.

¶ 67          Affirmed.